## ELIZABETH ARDEN SALES CORPORATION v. GUS BLASS CO.

### No. 12897.

Circuit Court of Appeals, Eighth Circuit.

July 31, 1945.

Rehearing denied Sept. 2, 1945.

J. W. Barron, of Little Rock, Ark. (J. Howard Carter, of New York City, on the brief), for appellant.

S. Lasker Ehrman, of Little Rock, Ark. (Grover T. Owens, of Little Rock, Ark., on the brief), for appellee.

Before SANBORN, JOHNSEN and RIDDICK, Circuit Judges.

JOHNSEN, Circuit Judge.

The action is one under the Clayton Act, as amended by the Robinson-Patman Act, for threefold the damages claimed to have been sustained from a violation of section 2(d) and (e), 49 Stat. 1527, 15 U.S.C.A. § 13(d) and (e). On a trial without a jury, the court entered a judgment against appellant for $3,030 and an attorney's fee, from which it has appealed.

The statutory subsections referred to provide:[1]

"(d) It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities.

"(e) It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms."

Appellant, a Delaware corporation, was the distributing and sales corporation of Elizabeth Arden, Inc., a manufacturer of cosmetic and toilet preparations. Appellee, an Arkansas corporation, was the owner and operator of a department store in Little Rock, Arkansas, which had a toilet-goods department. In August, 1938, appellee took on the Elizabeth Arden line

---

[1] Under 38 Stat. 730, 15 U.S.C.A. § 12, the word "person", for purposes of the Clayton Act, is made to include corporations.

of products in its store, under an oral agreement with appellant as part of which appellant was to designate one of the clerks in appellee's toilet-goods department as an Elizabeth Arden "demonstrator" and was to pay or reimburse appellee for one-half of her regular $20-a-week salary. This demonstrator was supposed to push the sale of Elizabeth Arden products, when it was fairly possible to do so, but, like every other clerk in the department, it was her duty to wait on the trade generally and to sell any toilet item or article that the store carried. The arrangement for partial payment or reimbursement of a clerk's salary, or for partial furnishing of a demonstrator-clerk's services, whichever one might choose to call it, remained in effect for approximately two years, at the end of which time appellant decided to discontinue selling further Elizabeth Arden products to appellee and to give M. M. Cohn Co., another department store in Little Rock, the right of exclusive local representation.

Cohn Co. had for some years previously been handling the Elizabeth Arden line and continued to do so during the time that appellee also was selling the products. This fact appellee knew and had understood at the time. Appellant did not inform it, however, that the arrangement which existed between Cohn Co. and appellant all during this time was that appellant, instead of paying or reimbursing Cohn Co. for half of a clerk's salary or furnishing half of a clerk's services, was making an allowance to Cohn Co. of $20 a week, or in other words was providing the entire salary or services of a clerk as a so-called demonstrator.

The purpose of the present action was to recover threefold the difference between the amount of the allowances made or the value of the services furnished to Cohn Co. and those made or furnished to appellee during the period that it purchased and sold appellant's products, on the theory that appellant had failed to pay clerk's salary or furnish clerk's services to it on proportionally equal terms with Cohn Co., and that it had been pecuniarily damaged by such discriminatory treatment to the extent of the difference in these amounts or values.

The trial court found that "the defendant [appellant] discriminated in favor of M. M. Cohn Company against the plaintiff [appellee], both of whom bought commodities from the defendant for resale, by contracting to furnish or by contributing to the furnishing of services and facilities connected with the sale and offering for sale of such commodities so purchased from the defendant, such discrimination consisting of the payment of the entire salary of defendant's representative in the M. M. Cohn Company store and one-half salary to the defendant's representative in the plaintiff's store"; that "had the defendant paid the plaintiff or allowed plaintiff credit for the entire salary of its demonstrator or representative in the plaintiff's store during the period of 101 weeks * * * the cost of the operation of the plaintiff's cosmetic department during that period of time would have been reduced at the rate of $10.00 per week, or an aggregate of $1,010.00"; and that "the plaintiff has accordingly been damaged to the extent of $1,010.00 on account of the increased cost of the operation of its cosmetic department as a result of the discrimination."

The trial court thus appears to have treated the comparative arrangements with Cohn Co. and with appellee as constituting an unlawful discrimination by appellant against appellee under section 2(e) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C.A. § 13(e), "by contributing to the furnishing of, any services or facilities connected with the * * * handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms." The situation probably might alternatively have been regarded as a discriminatory payment of compensation by appellant for special clerk's services or facilities furnished by Cohn Co. and by appellee in demonstrating or pushing the sale of appellant's products, instead of as a furnishing of clerk's services or facilities by appellant to Cohn Co. and to appellee, and so to constitute a violation of section 2(d) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C.A. § 13(d), as "the payment * * * as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the * * * handling, sale, or offering for sale of any products * * * unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities."

■ But whether the situation were construed as a discrimination under subsection (e) or as one under subsection (d) of section 2 would not seem to be of any importance here, except as there might be merit in appellant's contention that subsection (e) is unconstitutional—an attack which has not been made on subsection (d). Before proceeding to examine that question, it may be remarked generally that it was for the trial court, of course, to determine from the facts the nature of the discrimination under the statute, and that the interpretation which it has made of the present situation was a sound and proper one on the evidence. It may further be observed in passing that the Federal Trade Commission has, in a cease and desist order issued against appellant's sales-practices, involving arrangements such as those existing in the present case and some variations thereof, similarly branded appellant's general scheme as a violation of section 2(e) of the Clayton Act, as amended by the Robinson-Patman Act. In the Matter of Elizabeth Arden, Inc., Elizabeth Arden Sales Corporation, and Florence N. Lewis, F.T.C. Doc. No. 3133, 3 C.C.H. Trade Reg. Serv. No. 12,-962.

Appellant contends, as we have indicated, that section 2(e) is unconstitutional. The basis of its argument is that subsection (e) imposes a prohibition on "any person", without the limitation "engaged in commerce",[2] such as is specifically incorporated in subsections (a), (c), (d) and (f) of section 2 and in other portions of the Act, and that, unlike the rest of the Act, it therefore must be held to have been intended to cover persons engaged in either intrastate or interstate commerce and hence is void. Reliance is placed on the Trade-Mark Cases, United States v. Steffens, etc., 100 U.S. 82, 96, 97, 25 L.Ed. 550, where, in some criminal prosecutions under a statute which made the fraudulent use, sale and counterfeiting of trademarks registered pursuant to the laws of the United States a punishable offense, without limiting the application of the statute to trademarks used in interstate or foreign commerce, the court said: "When, therefore, Congress undertakes to enact a law, which can only be valid as a regulation of commerce, it is reasonable to expect to find on the face of the law, or from its essential nature, that it is a regulation of commerce with foreign nations, or among the several States, or with the Indian tribes. If not so limited, it is in excess of the power of Congress. If its main purpose be to establish a regulation applicable to all trade, to commerce at all points, especially if it be apparent that it is designed to govern commerce wholly between citizens of the same State, it is obviously the exercise of a power not confided to Congress."

The opinion in the Trade-Mark Cases cites United States v. Reese, 92 U.S. 214, 23 L.Ed. 563, where it was analogously held that a statute which made it a criminal offense for any person by threats, intimidation, etc., to prevent a citizen from qualifying to vote or from voting, without limiting the application of the statute to denials on account of race, color, or previous condition of servitude under the Fifteenth Amendment, was invalid. The court in that case said, 92 U.S. at pages 219 and 220, 23 L.Ed. 563: "This is a penal statute, and must be construed strictly; not so strictly, indeed, as to defeat the clear intention of Congress, but the words employed must be understood in the sense they were obviously used. * * * If, taking the whole statute together, it is apparent that it was not the intention of Congress thus to limit the operation of the act, we cannot give it that effect. * * * If the legislature undertakes to define by statute a new offence, and provide for its punishment, it should express its will in language that need not deceive the common mind. Every man should be able to know with certainty when he is committing a crime."

James v. Bowman, 190 U.S. 127, 23 S.Ct. 678, 47 L.Ed. 979, applied the principle of the Steffens and Reese cases, in holding invalid a statute, which made it a criminal offense for any one to intimidate another in the exercise of his right of franchise, where such person was one to whom the right was guaranteed by the Fifteenth Amendment, because its language was not limited to congressional and presidential elections and there was nothing to show that Congress did not intend it to have application to elections of state and local officers as well.

---

[2] Section 1 of the Clayton Act, 15 U.S. C.A. § 12, provides that the term "commerce" as used in the statute "means trade or commerce among the several States", etc.

992

Hill v. Wallace, 259 U.S. 44, 42 S.Ct. 453, 66 L.Ed. 822, which was a suit for an injunction, declared the Future Trading Act of 1921, 42 Stat. 187, invalid on a number of grounds and in discussing its validity in relation to the commerce clause, 259 U.S. at pages 68 and 69, 42 S.Ct. 458, 66 L.Ed. 822, said: "We come to the question then: Can these regulations of boards of trade by Congress be sustained under the Commerce clause of the Constitution? * * * There is not a word in the act from which it can be gathered that it is confined in its operation to interstate commerce. The words 'interstate commerce' are not to be found in any part of the act from the title to the closing section. * * * It [Congress] did not have the exercise of its power under the commerce clause in mind, and so did not introduce into the act the limitations which certainly would accompany and mark an exercise of the power under the latter clause."

■ These decisions, however, do not in our opinion compel the conclusion in the present case that, because Congress has failed to include the words "engaged in commerce" or other similar specific expression in subsection (e) of section 2, that subsection must be declared to be unconstitutional. In the first place, neither subsection (e) nor any other portion of section 2 is a criminal provision, and the degree of strictness which, oftentimes with some arbitrariness perhaps, has been applied in the construction of a criminal statute is not controlling. The criminal provisions of the Robinson-Patman Act are contained in section 3, 15 U.S.C.A. § 13a, which is complete in itself and in which appear the limitative words that appellant insists should also have been expressed in section 2(e). The cases on which appellant relies thus would be without application in any proceeding instituted against it for a criminal violation of the Robinson-Patman Act. Again, as previously indicated, the limitation "engaged in commerce" also directly appears in subsections (a), (c), (d) and (f) of section 2, all of which are co-ordinate enumerations with subsection (e) of the various trade practices intended to be prohibited. And there is nothing in the committee reports or in the expressions on the floors of Congress to suggest that subsection (e) was designed or meant to have a more extensive reach than the other subsections of section 2 or than the criminal provisions

of section 3. See Report No. 2287, House of Representatives Committee on Judiciary, 74th Cong., 2d Sess., and Report No. 1502, Senate Committee on Judiciary, 74th Cong., 2d Sess. On the contrary, the discussions on the floors of Congress several times specifically refer to the fact that the Act was and could be applicable only to interstate commerce. As an example, it was stated in the Senate that the purpose of the bill was to deal with some of the practices which had been resorted to in evading the Clayton Act; that there were "ways of evading the Clayton Act which perhaps cannot be reached by Congress"; and that "We can reach only those things that relate to interstate commerce or have a direct bearing upon interstate commerce." See Remarks of Senator Logan, 80 Cong.Rec., part 6, page 6281.

Reading the subsections of section 2 as a whole and also with the criminal provisions of section 3, and viewing the Robinson-Patman Act in its unity and in its interrelation to the Clayton Act, we do not see how any possible doubt can exist that Congress intended that subsection (e), equally with the other subsections of section 2, should apply only to those engaged in interstate commerce, and that the omission of the limitative expression "engaged in commerce" from the language of subsection (e) was patently inadvertent, but that the words by sound implication are inherent in its general and sectional context. Cf. Kennedy v. Gibson, 8 Wall. 498, 506, 507, 75 U.S. 498, 506, 507, 19 L.Ed. 476. Indeed, even within the language of the cases on which appellant relies and from which we have quoted, it can hardly here be said, as in the Steffens case, that there is nothing "on the face of the law, or from its essential nature", to show that the Robinson-Patman Act was intended to apply only to interstate commerce, or, as in the Reese case, that, "taking the whole statute together, it is apparent that it was not the intention of Congress thus to limit the operation of the act", or, as in the Hill case, that "There is not a word in the act from which it can be gathered that it is confined in its operation to interstate commerce", and "The words 'interstate commerce' are not to be found in any part of the act from the title to the closing section."

■ The question, as in any case of statutory construction, is one of soundly seeking and tolerantly effectuating convinc-

ing legislative intention. United States v. N. E. Rosenblum Truck Lines, 315 U.S. 50, 53, 62 S.Ct. 445, 448, 86 L.Ed. 671. In the discovery of congressional intention, no invariable rule is controlling. United States v. American Trucking Associations, 310 U.S. 534, 542-544, 60 S.Ct. 1059, 84 L. Ed. 1345. The language of an act is, of course, the fundamental guide to legislative meaning and purpose, but it is the language of the act as a whole that is to be read and not the words of a section or provision in isolation, for "courts will construe the details of an act in conformity with its dominating general purpose, will read text in the light of context and will interpret the text so far as the meaning of the words fairly permits so as to carry out in particular cases the generally expressed legislative policy." Securities and Exchange Commission v. C. M. Joiner Leasing Corporation, 320 U.S. 344, 350, 351, 64 S.Ct. 120, 123, 88 L.Ed. 88. And so, while courts are and should be cautious about adding words as such to a statute generally, they will not hesitate to read into the sense of some section or provision a qualifying or expanding expression plainly implied by the general context of the act, which has been palpably omitted and which is necessary to prevent the legislative purpose from failing in one of its material aspects. 50 Am.Jur., Statutes, § 235; and compare Kennedy v. Gibson, 8 Wall. 498, 506, 507, 75 U.S. 498, 506, 507, 19 L.Ed. 476.

■■■ We are convinced, for the reasons we have stated, that subsection (e) of section 2 was intended to apply only to persons "engaged in commerce" and should be so construed, and that it is accordingly not void. It is not improper to note that, though the specific question cannot be said to have been raised in Corn Products Refining Co. v. Federal Trade Commission, 65 S.Ct. 961, 969, 970, the Supreme Court appears in that case to have accepted and treated subsection (e) as being valid. We may further add that, even if subsection (e) had been invalid, we would not for that reason have reversed the judgment, because, as we have previously indicated, the situation could just as properly on the evidence have been treated as a violation of subsection (d)—a fact which appellant does not dispute—and this would be sufficient to permit us to affirm the judgment, if there is no merit in appellant's remaining contentions hereafter to be considered. An appellate court recognizedly may, when necessary, sustain a correct judgment on a different ground than that adopted by the trial court, where such a ground is one that is within its power to formulate. Securities and Exchange Commission v. Chenery Corporation, 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626; J. E. Riley Inv. Co. v. Commissioner of Internal Revenue, 311 U.S. 55, 59, 61 S.Ct. 95, 85 L.Ed. 36; Chaires v. United States, 3 How. 611, 618, 44 U.S. 611, 618, 11 L.Ed. 749. Here the matter merely would be one of legal determination of what statutory subsections properly could be applied to the findings made by the trial court or to the evidence, which on the aspect involved was undisputed.

Appellant contends, however, that whether subsection (e) or subsection (d) were applied there was no illegal discrimination under either subsection, because on the basis of purchases made appellee had received clerk's services or clerk's salary "on proportionally equal terms" with Cohn Co. Appellant hypothesizes the situation by taking the total amount of products purchased by Cohn Co. over the entire period involved, in the sum of $18,593.40, and the total amount purchased by appellee, in the sum of $11,250.35, then deducting the amount of goods, in the sum of $2,463.04, which Cohn Co. took off appellee's hands by direct purchase after it was given the exclusive Arden representation, and finally comparing the net figure of $8,787.51 for appellee with the figure of $18,593.40 for Cohn Co.

There are a number of fallacies, however, in this argument. First of all, appellee bought $11,250.55 and not $8,787.51 worth of goods from appellant during the period that the alleged discrimination was occurring, and the subsequent purchase of appellee's remnant stock by Cohn Co., in order to establish its position of exclusive representative, could hardly be claimed to have reduced the amount of appellee's purchases from appellant during the discrimination period. In the next place appellant's retrospective effort to adopt appellee's entire purchasing period as the base for testing the question of proportional treatment in relation to the amount of goods bought is purely artificial, for the evidence does not show that its policy of furnishing clerk's services or paying clerk's salaries ever was related to such a base. In passing, it may also be noted that, if

appellant had undertaken to make a comparison of purchases by a calendar year, appellee's purchases for the period that it handled appellant's products in 1938 would have shown $5,117.78 as against $3,834.83 for Cohn Co., and if a fiscal year had been taken commencing with the date that appellee began handling appellant's products it would have shown purchases of $7,086.86 by appellee during that specific period as against $7,575.82 by Cohn Co.

But all these compilations of purchases on different time-bases are without relevance here, for there is another fallacy in appellant's argument which is inescapably conclusive in the situation. On the findings of the trial court and the evidence, appellant's furnishing of clerk's services or payment of clerk's salaries to appellee and Cohn Co. cannot be claimed to have ever had any established or determinable basis or standard whatever. The allowance had been fixed in both instances at the time the purchase of goods began, and there it simply remained. Its amount was arrived at by personal negotiation and individual agreement. There was no arrangement or provision for graduating it to the amount of goods purchased during any given period. Nor was it based upon any other guiding factor, such as a difference in the character of the stores and the type of facilities afforded for handling appellant's products, if that could have been made to constitute a valid legal distinction. And, in the present situation, no such difference could possibly have been contended to exist in fact, for, as the trial court pointed out in its findings, appellee and Cohn Co. were located virtually next door to each other; appellee's store was the more modern of the two, both as to building and furnishings, and among other things it alone was air-conditioned; appellee's facilities for the display and sale of toilet preparations were at least equal to if not better than those of Cohn Co.; the toilet-goods departments of both stores were located in choice street-level space; and both stores advertised and otherwise fully competed with each other for the trade in appellant's products.

The agreement which appellant made with appellee provided no path on which appellee could travel to qualify or to claim the right to have earned the additional services or salary which appellant was allowing Cohn Co. That appellant's whole policy was simply one of random and arbitrary arrangement was also made to appear from the varying customer allowances shown by its general records, which the court admitted in an effort to get at whether any possible standard reasonably could be said to exist that might justify the difference in treatment between appellee and Cohn Co. These records showed numerous instances of full allowances of clerk's services or clerk's salaries to customers in other cities throughout the country, whose purchases had been less in amount than those of appellee. They showed also different allowances to customers in the same city, whose purchases had been practically identical in amount with each other.

We think it must be held that a seller engaged in commerce who furnishes clerk's services or pays clerk's salaries in unequal amounts to customers competing in the distribution of its products, which amounts have no other basis or standard than the seller's discretion or favor, and as to which there is no competitive way for such customers to qualify for proportional or equal levels, is, to the extent of any differences in such amounts, guilty of a discrimination in the furnishing of services or facilities under subsection (e) or in the payment for services or facilities under subsection (d) of section 2 of the Clayton Act as amended by the Robinson-Patman Act, 15 U.S.C.A. § 13(e) and (d). That which was discriminatory under the statute when done, because wholly unrelated to any proportionalized basis or standard, cannot subsequently, in order to enable the seller to escape damages for the discrimination, be artificially tailored into proportionally equal terms by fitting it to some imaginary basis or standard that has never in fact existed.

The Federal Trade Commission has aptly expressed the situation in relation to subsection (e), in the cease and desist order which it issued against appellant, as referred to above: " * * * the statute affords the seller a free election in the first instance as to what services or facilities, if any, he will provide to purchasers of his products; but having elected to furnish a particular service or facility to a particular purchaser or purchasers, he thereby assumes the obligation of according similar services to all competing purchasers to the extent required by the statute. The furnishing of a service or facility which cannot be proportionalized for the benefit of competing purchasers or,

in the alternative, the failure or refusal to proportionalize the terms upon which services or facilities are granted, so as to make it reasonably possible for competing purchasers to avail themselves of such services or facilities if they desire to do so, constitutes a failure to accord such services or facilities upon proportionally equal terms."

Appellant's final contention relates to the question of damages. It argues that, even if it has been guilty of an unlawful discrimination, appellee has failed to prove any legal damage. The trial court found, as previously set out, that "had the defendant paid the plaintiff or allowed the plaintiff credit for the entire salary of its demonstrator or representative in the plaintiff's store during the period of 101 weeks * * * the cost of the operation of the plaintiff's cosmetic department during that period of time would have been reduced at the rate of $10.00 per week, or an aggregate of $1,010.00", and that "the plaintiff has accordingly been damaged to the extent of $1,010.00 on account of the increased cost of operation of its cosmetic department as a result of the discrimination."

The point urged by appellant is that a discrimination in furnishing clerk's services or paying clerk's salaries cannot of itself constitute a legal damage but that appellee must prove some special injury to its business. The decisions under section 8 of the Interstate Commerce Act, 24 Stat. 382, 49 U.S.C.A. § 8, are relied on in support of this contention. See Parsons v. Chicago & N. W. R. Co., 167 U.S. 447, 17 S.Ct. 887, 42 L.Ed. 231; Pennsylvania R. Co. v. International Coal Min. Co., 230 U.S. 184, 33 S.Ct. 893, 57 L.Ed. 1446, Ann. Cas.1915A, 315; Meeker v. Lehigh Valley R. Co., 236 U.S. 412, 35 S.Ct. 328, 59 L. Ed. 644, Ann.Cas.1916B, 691; Davis v. Portland Seed Co., 264 U.S. 403, 44 S.Ct. 380, 68 L.Ed. 762; Interstate Commerce Commission v. United States ex rel. Campbell, 289 U.S. 714, 53 S.Ct. 524, 77 L.Ed. 1467. But the effect of these decisions, if we correctly interpret their rationale and policy, is simply to hold that the inherent nature of the commands and prohibitions of the Interstate Commerce Act prevents any recognition of a legal right to recover general damages under that Act, and that any recovery therefore necessarily must be limited to special damages only. To permit a recovery of general

damages for the amount of a discriminatory rebate or concession under that Act would be equivalent to the granting of another rebate or concession, which it was the very purpose of the Act altogether to prohibit. Because, therefore, a carrier has committed one illegal act, Congress did not intend that it should be compelled or permitted to commit another.

As was pointed out in Pennsylvania R. Co. v. International Coal Min. Co., 230 U. S. 184, 202, 33 S.Ct. 893, 898, 57 L.Ed. 1446, Ann.Cas.1915A, 315, "Making an illegal undercharge to one shipper did not license the carrier to make a similar undercharge to other shippers, and if, having paid a rebate of 25 cents a ton to one customer, the carrier, in order to escape this suit, had made a similar undercharge or rebate to the plaintiff, it would have been criminally liable, even though it may have been done in order to equalize the two companies." Or, as was said in Texas & Pac. R. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 445, 27 S.Ct. 350, 357, 51 L.Ed. 553, 9 Ann.Cas. 1075, "In view of the binding effect of the established rates upon both the carrier and the shipper, * * * the contention now made, if adopted, would necessitate the holding that a cause of action in favor of a shipper arose from the failure of the carrier to make an agreement, when, if the agreement had been made, both the carrier and the shipper would have been guilty of a criminal offense and the agreement would have been so absolutely void as to be impossible of enforcement."

And so, from the inherent nature and purpose of the Interstate Commerce Act, the granting of a prohibited rebate or other concession by a carrier, while resulting in the acquiring of an improper gain by one shipper, could not per se amount to the suffering of a legal damage by another. But these considerations and deterrents in relation to the Interstate Commerce Act can hardly be said to require that every damage statute for commercial discriminations, though couched in similar language, must be construed as a special damage statute only. A damage statute of general terms should be read in relation to the provisions and policy of the act of which it is a part. Mr. Justice Cardozo pointed out, in discussing the damage question under the Interstate Commerce Act, in Interstate Commerce Commission v. United States ex rel. Campbell,

289 U.S. 385, 393, 53 S.Ct. 607, 611, 77 L. Ed. 1273, "how much the rule of damages is beset by delicate distinctions, how pre-eminently in applying it there is a call upon the judge to think and act judicially, to use judgment and discretion."

The subsections of the Robinson-Patman Act that are here involved, unlike the prohibitions in the Interstate Commerce Act, are not designed to prevent the furnishing of clerk's services or the payment of clerk's salaries to any customer, but their purpose on the contrary is to require and assure that such services or salaries, in whatever amount they may be furnished or paid to any customer, shall be made available to every other competing customer on proportionally equal terms. What the seller is thus both permitted and commanded to do, we can see no sound reason under the language or policy of the statute for not compelling him to do by an action for general damages, where such damages have been directly suffered and are plainly measurable. Thus, in the present case, it is obvious, as the trial court found, that appellee has sustained a direct loss in "the increased cost of the operation of its cosmetic department", to the extent of the difference in the allowances, which were arbitrarily made and without any proportionalized basis or standard. To relieve the seller of the obligation to equalize such a discrimination through readily determinable general damages, where no special damages exist or are claimed, would be to weaken the effectiveness of the statute in compelling obedience to its commands.

▆ We do not mean to imply, of course, that every situation under the Robinson-Patman Act is subject to a general damage right. Discriminations obviously are possible, from whose nature there can be no direct or general damages but only consequential or special damages. For example, a discriminatory allowance of funds to a customer, to be used by him solely in advertising or promoting business in the seller's goods, would perhaps not furnish a basis for general damages, since the injury to a competitor probably would depend upon the results which the advertising funds produced, and hence the damages from the difference in treatment would not be direct but consequential. Again, under subsection (c), 15 U.S.C.A. § 13(c), which prohibits the granting of any commission or brokerage by a seller to

any customer or his agent, no general damage right would probably exist, for the same reason that is controlling as to rebates or other concessions under the Interstate Commerce Act. But these various possible special situations are of no importance in relation to the general damages which can rightfully exist under subsections (e) and (d). Certainly the result of the discrimination in the present case was to leave appellee with a burden of expense in the handling of appellant's products that Cohn Co. was not required to bear. This unequal expense-burden which appellee would not have had to bear if there had been no discrimination was clearly a direct business-damage, and the multiplication of the damage, which the statute allows when there is a recovery, is in the nature of a penalty for having occasioned the injury.

▆ Appellant further points out, however, that the bill which became the Robinson-Patman Act, as originally introduced in Congress, had contained a provision that "the measure of damages for any violation of this section shall, where the fact of damage is shown, and in the absence of proof of greater damage, be presumed to be the pecuniary amount or equivalent of the prohibited discrimination, payment, or grant involved in such violation", and that this provision was stricken from the bill. But, if general damages are entitled to be recovered under the Act, as we hold, in situations where the amount of the discrimination properly can be said to constitute a direct and legal damage, as in the present case, the stricken provision would not, even if enacted, have had any significance except in relation to those situations where only special or consequential damages can possibly exist, and the effect of its omission would simply be to require that the amount of such damages must specifically be proved.

The judgment is affirmed.

RIDDICK, Circuit Judge (dissenting).

I do not agree with the majority opinion. I am unable to find in the record either a clear claim or any proof of damage to the business or property of Blass. The Act under which the suit is brought authorizes only the recovery of damage to the business or property of the victim of a prohibited discrimination; and, as the majority opinion shows, Congress expressly

refused to sanction the rule for the measure of damages adopted by the court in this case, even where there is proof of actual damage to the business or property of the complainant, of which, in this case, there is none.

As I understand the opinion, the theory underlying it is that the Robinson-Patman Act not only permits, but requires the seller in interstate commerce, who makes payments to retailers of the character involved in this case, to make them upon proportionately equal terms; and that, where the victim of a prohibited discrimination is unable to prove any damage to his business or property as a proximate result of a discrimination against him, he should, nevertheless, be permitted to recover, under the guise of damages, the difference between the amount paid to him and such amount as would have made his payment in terms proportionately equal to that made to his competitor. Thus the court substitutes for the simple action for damages authorized by the Act a proceeding to restore equality of terms among competitors where it had been denied and to recover a penalty, since three times the sum necessary to restore equality is recovered.

There are, it seems to me, several insuperable objections to this interpretation of the statute. One is that it requires the court to read into the Act provisions which Congress expressly refused to include in it. Another is that damages which can not be established with reasonable certainty are not recoverable. And still another is that, if the action for damages authorized by the Act was intended as a means of establishing proportionate equality where discrimination had existed among competitors in the past, the provision for three-fold recovery not only prevents that result, but makes of the Act an instrument for creating the discrimination which Congress sought to prevent.

Obviously, under the interpretation of the Act which is made in the majority opinion, the victim of an illegal discrimination may not be permitted to recover more than a sum sufficient to place him on terms of proportionate equality with his competitor. The result of such a recovery would be to substitute one violation of the Act for another. And such is the result of the present decision. Blass, the supposed victim of an illegal discrimination, now becomes the very definite beneficiary of it, while Cohn, the former beneficiary, is now the certain victim; and Arden reimburses Blass for damages to its business or property which it never sustained.