**STATE WHOLESALE GROCERS, an Illinois corporation, et al., Plaintiffs-Appellants,**

v.

**The GREAT ATLANTIC & PACIFIC TEA COMPANY, a New Jersey corporation, et al., Defendants-Appellees.**

No. 12178.

United States Court of Appeals
Seventh Circuit.

July 25, 1958.

As Amended Sept. 17, 1958.

Rehearing Denied Sept. 23, 1958.

Rehearing En Banc Denied Sept. 23, 1958.

Robert Marks, Harry Henry, Chicago, Ill., William S. Kaplan, Chicago, Ill., Marks, Marks & Kaplan, Chicago, Ill., Libit, Lindauer & Henry, Chicago, Ill., of counsel, for appellants.

John T. Cahill, New York City, Thomas R. Mulroy, Chicago, Ill., Daniel Walker, Hopkins, Sutter, Owen, Mulroy & Wentz, Chicago, Ill., Cahill, Gordon, Reindel & Ohl, New York City, by Lawrence J. McKay, Jerrold G. Van Cise, William E. Hegarty, New York City, Fred E. Campbell, New York City, of counsel, for appellees, Great Atlantic & Pacific Tea Co., Inc. and Woman's Day, Inc.

Sidney S. Gorham, Jr., Miller, Gorham, Wescott & Adams, Chicago, Ill., Hubert G. Hanson, Eugene C. Nicolato, White Plains, N. Y., Edward R. Adams, Chicago, Ill., Frederick F. Mack, White Plains, N. Y., of counsel, for General Foods Corp. and Hunt Foods, Inc.

John P. Ryan, Jr., Chicago, Ill., L. M. McBride, Chicago, Ill., McBride, Baker, Wienke & Schlosser, Chicago, Ill., of counsel, for Morton Salt Co.

Before MAJOR, FINNEGAN and SCHNACKENBERG, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

State Wholesale Grocers and Zeigmund Wholesale Grocery Co., Inc., Illinois corporations (hereinafter referred to as plaintiff wholesalers), and a group of individual store retailers of grocery products and other related products (hereinafter referred to as plaintiff retailers), all engaged in business in the Metropolitan Area of Chicago, Illinois, sued in a class suit [1] in the district court for treble damages and for injunctive relief under the Clayton Act, as amended by the Robinson-Patman Act.[2] The case was tried without a jury upon the is-

1. Pursuant to 28 U.S.C.A. rule 23, Fed. Rules Civ.Proc.

2. 15 U.S.C.A. §§ 12–27.

sue of liability, the court having, for the purposes of trial, separated that issue from the issue of damages. Judgment was entered in favor of defendants and and misapplying said act, primarily §§ 2(d) and 2(e) thereof.[3]

As a result of a commendable cooperation in which the district judge and counsel for all parties joined, all of the evidence, documentary and otherwise, was stipulated, reserving to each party the right to argue the materiality or relevancy thereof.

There is no significant dispute as to the basic facts pertinent to the decision. We are thus not confronted here with the provision of Federal Rules of Civil Procedure, 52(a), that findings of fact shall not be set aside unless clearly erroneous. United States v. E. I. Du Pont De Nemours & Co., 353 U.S. 586, 598, note 28, 77 S.Ct. 872, 1 L.Ed.2d 1057.

The district court made 183 findings of fact and 18 conclusions of law, which are set forth as a part of its published opinion.[4]

While in the district court the issue of liability involved §§ 2(a), 2(d), 2(e) and 2(f) of the Clayton Act, on appeal plaintiffs in effect have concentrated upon only §§ 2(d) and 2(e).[5]

The facts below set forth are established by the record. They include certain facts, *inter alia,* which we have found contrary to some found by the district court.

Defendant, The Great Atlantic and Pacific Tea Company, a New Jersey corporation, herein referred to as A & P, is a retail chain enterprise operating over 200 stores throughout the Metropolitan Area of Chicago with approximately 126 stores located in that city. It handles grocery products, in varying percentages of its gross sales. There are other retail groceries and wholesale grocers in the Area. Each plaintiff wholesaler sells to independent retail grocery stores which are in competition with A & P.

Defendants General Foods Corporation, Morton Salt Company and Hunt Foods, Inc., are corporate suppliers of grocery products in the United States whose brands of products are nationally known by their names and accepted by the consuming public. They are hereinafter referred to sometimes as "suppliers" or "defendant suppliers." At all times pertinent herein some of the products of each of the suppliers was handled and sold by the A & P stores, plaintiff retailers, plaintiff wholesalers, and other retail groceries and wholesale grocers in the Area.

Defendant Woman's Day, Inc., is a New York corporation, all of the capital stock of which is held by The Great Atlantic and Pacific Tea Company, a Maryland corporation.[6]

Woman's Day is a magazine published, since 1949, by Woman's Day, Inc. It ranks in circulation and advertising among the leading national magazines, such as Life, Saturday Evening Post and Better Homes & Gardens, was the recipient of national awards for editorial, art and homemaking accomplishments, and is of content and quality comparable to and competitive with the well-known Good Housekeeping, Ladies' Home Journal, McCall's, Woman's Home Companion, and Household magazines. The cost per single copy for printing, publishing and distributing Woman's Day varied from approximately 17¢ to 21¢ during 1954, 1955, and 1956. It has been selling for 7¢ since 1951[7] (having originally

---

3. 15 U.S.C.A. § 13(d) and 13(e).

4. 154 F.Supp. 471, 485, 506.

5. This amounts to an abandonment by plaintiffs of reliance upon §§ 2 (a) and 2(f). Moreover, by stipulations in the district court, plaintiffs withdrew any claims under the Sherman Act. 15 U.S. C.A. §§ 1 and 2. Therefore, insofar as the foregoing sections are concerned, we are required to affirm the judgment of the district court in favor of defendants A & P and Woman's Day, Inc.

6. Defendant A & P is a wholly owned and controlled subsidiary of the Maryland corporation.

7. Until this suit was filed.

been given away free), whereas Good Housekeeping, Ladies' Home Journal, McCall's and Woman's Home Companion sell on the newsstands for 35¢ per single the cause was dismissed. Plaintiffs have appealed. They rely on the district court's alleged error in misconstruing copy. These latter magazines are obtainable at newsstands, drug stores, grocery stores, department stores and other sources as well as by subscription. Woman's Day is and always was obtainable only at A & P stores. It cannot be purchased by subscription, nor can it be purchased at a newsstand (except in Colorado where only about .4% of each issue is distributed and where A & P has no retail stores), drug store, other grocery store, department store or from other sources.

Since its inception Woman's Day has been identified as the A & P magazine. Since 1953, the cover of the magazine has carried the words "The A & P Magazine." It is actively promoted for sale by the use of all types of internal and external media, including other magazines, newspapers, radio and television. All of its food advertising is of products sold in A & P stores. However, there is no other significant relationship between A & P's handling of a supplier's food products and the advertising thereof in Woman's Day. That magazine also advertises the food products manufactured by A & P through its subsidiaries and sold only in A & P stores.

Woman's Day is an effective medium for the advertisement of the A & P stores in general. It creates good will among the customers of A & P. It attracts new customers for A & P and keeps its old ones. It sells approximately 42 million copies a year. It is a promotional operation of A & P. It exists solely for competitive benefit to A & P's retail stores.

The annual cost of producing Woman's Day exceeds $9,000,000. Less than one-quarter of this cost is recovered through the sale of copies. The remainder is received from the sale of advertising space. This advertising revenue is received from suppliers and non-suppliers. Supplier advertisers are manufacturers whose products are sold in A & P stores, such as the three defendant suppliers. In 1954, 73.3% of the advertising revenue, or $6,905,021, and in 1955, 65.5% or $6,073,693, was received from supplier advertisers.

The number of Woman's Day advertisers in each class and the gross advertising revenue derived from each class in 1954 and 1955 were as follows:

Advertisers in Woman's Day

| 1954 | | |
|---|---|---|
| Suppliers | 203 | 49.3% |
| Non-suppliers | 209 | 50.7% |
| Total | 412 | 100% |
| **1955** | | |
| Suppliers | 172 | 47.6% |
| Non-suppliers | 189 | 52.4% |
| Total | 361 | 100% |

Revenue to Woman's Day from:

| 1954 | | |
|---|---|---|
| Suppliers | $6,905,021 | 73.3% |
| Non-suppliers | 2,508,822 | 26.7% |
| Total | $9,413,843 | 100% |
| **1955** | | |
| Suppliers | $6,073,693 | 65.5% |
| Non-suppliers | 3,205,488 | 34.5% |
| | $9,279,181 | 100% |

None of the plaintiff retailers or wholesalers owned or published a magazine of any kind. For certain periods covered by the complaint in this case, some of the plaintiff retailers carried a store distributed magazine, while others did not. Since May of 1956 no store distributed magazine has been available in the Area to any independent retailers or wholesalers, and since June of 1954 only one such magazine was on the market for handling by some independent retailers who were members of a particular co-operative purchasing group. It was known as Better Living and it ceased publication in May 1956. These facts were known to the defendant suppliers.

Defendant suppliers from time to time advertised in the store distributed magazines in addition to Woman's Day.

Woman's Day is shipped by Woman's Day, Inc. to various Unit warehouses of A & P, from which the magazine is delivered by truck, with rare exceptions, to the individual A & P retail stores.

All A & P self-service stores are supplied with cash register racks to hold the copies of Woman's Day on sale. These racks are attached to the cash register at the check-out counters.

About 14,000 copies are sold each month in the State of Colorado by an independent distributor. Since February, 1951 the retail price has been 15¢.

Advertising of A & P and its subsidiaries and divisions, in Woman's Day, is placed through Paris & Peart, Inc., New York City, an advertising agency. The latter is an independent agency which also represents clients other than A & P and its subsidiaries.

The sale of advertising space in Woman's Day is pursuant to contracts between Woman's Day, Inc. and the advertising agency representing the advertiser. That advertising agency pays Woman's Day, Inc. the established advertising rate for the space purchased, less the customary agency commission of 15%, and collects from the advertiser the full charge for the space purchased. It is the general practice for the advertising agency, often after consultation with representatives of the advertiser, to recommend the media to its client. When Woman's Day is recommended, it is solely upon the evaluation by such agencies of Woman's Day as an effective advertising medium for the sale of the products of their respective clients to the consumer public. The advertising rates charged by Woman's Day, Inc. to Paris & Peart, Inc. for advertising placed in Woman's Day in behalf of A & P are the same as are charged by Woman's Day, Inc. to all other advertisers. Many nationally recognized advertising agencies have for years placed advertising in Woman's Day in behalf of their clients.

The rates paid by advertisers in Woman's Day are comparable to and competitive with those charged by magazines of comparable national circulation. Such advertising rates for 1956 were based upon a guarantee of a net paid advertising circulation of 3,375,000 during the calendar year. Certifications of circulation were made periodically by the Audit Bureau of Circulations, of which Woman's Day, Inc. is a member. When in any given period Woman's Day, Inc. failed to deliver the circulation it had guaranteed its advertisers, it thereupon, pursuant to contract, made an adjustment to all of its advertisers. Such an adjustment is standard practice in the publishing business. The actual payments for such adjustments were made by Woman's Day, Inc. to the advertising agencies for the accounts of their respective clients.[8]

Woman's Day, Inc. has never given any refunds, rebates, credits, gratuities or allowances to A & P or any of its subsidiaries or divisions, with the exception of the circulation billing adjustments given to all advertisers.

At the time of the initial placement and on the occasion of each subsequent placement of advertising in behalf of defendant suppliers in Woman's Day, they were then selling, and had for some time prior thereto sold, products to A & P for resale through A & P retail stores.

The defendant suppliers have also advertised various of their products from time to time in other magazines of general circulation, such as Family Circle, Western Family, Everywoman's, American Family, Better Living, Good Housekeeping, Household, Ladies' Home Journal, Life, Saturday Evening Post, Colliers, Better Homes & Gardens, and Woman's Home Companion.

8. During the calendar year 1955, Woman's Day, Inc. was unable to meet the guaranteed paid average circulation of 3,750,000 specified in its national rate card as the basis for its advertising rates, the average for that year being 3,500,000. It refunded 6.86% of its total advertising revenue for 1955.

Typical manufacturers, advertising in Woman's Day and whose products are not sold in any A & P store, are the following:

| | |
|---|---|
| Armstrong Cork Company | Floor coverings |
| General Electric Co. | Refrigerators |
| Spiegel, Inc. | Mail order |
| Olson Rug Co. | Rugs |
| Zenith Radio Corp. | Hearing aids |
| Toni Company | Home permanents |
| RKO Radio Pictures, Inc. | Motion pictures |

———◆———

The following manufacturers are typical of those (in addition to defendant suppliers), advertising in Woman's Day and whose products are sold in A & P stores:

| | |
|---|---|
| American Tobacco Co. | Cigarettes |
| The Borden Company | Cheese and milk |
| Harold H. Clapp | Baby food |
| General Mills, Inc. | Flour and cereals |
| H. J. Heinz Co. | Baby food and soups |
| Quaker Oats Co. | Cereals and dog food |
| Swift and Company | Meat products |
| William Wrigley Co. | Chewing gum |

———◆———

1. The essentially relevant language of § 2(e) is:

"It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity * * * by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities * * *."

The service or facility involved in this case is the publication Woman's Day. We find from the record before us that there is an absence of any evidence that defendant suppliers furnished or contracted to furnish, or contributed to the furnishing of, this publication. We are aware that the annual cost of producing the magazine exceeded $9,000,000 and that the revenue recovered from the sale of advertising space therein was equal to three quarters of that amount. We are further aware that in 1954, of the advertising revenue thus received, about 73% thereof was received from supplier advertisers as against about 26% received from non-supplier advertisers, and that in 1955 the corresponding percentages were about 65% from suppliers and about 34% from non-suppliers.

■ Plaintiffs argue that what they urge is a violation of § 2(e) is not "made less so because the payment of the supplier is for advertising within the magazine, for the consequence thereof is that such payments pay a part of the cost of the magazine which A & P does not therefore have to pay. It is the absorption of the favored customer's costs which violates the Sections, and this is done whether or not those costs are paid by the supplier in exchange for advertising space." However, even if these conclusions of plaintiffs are factually correct, they do not embody the test set forth in § 2(e), which requires that plaintiffs prove that defendant suppliers furnished or contracted to furnish or contributed to furnishing of the magazine in question. While a passenger upon a railroad, when he pays his fare, may pompously remind a conductor that he is contributing to the payment of the conductor's salary, the transaction actually

is not a traceable contribution to any one specific item of the railroad's expenditures for operation. The fare becomes commingled with other revenue of the carrier and, although it augments the mass of gross revenue from which the salaries of employees and other expenses are paid, it cannot sensibly be said that any one passenger is furnishing or contributing to the salary of any one employee. If a contrary interpretation of such a transaction were intended by Congress to be applied to the payment of advertising charges by an advertiser in a magazine, to the end that each dollar paid by the advertiser on its bill for advertising therein should be considered the furnishing or contributing to the furnishing of the publication itself, Congress would have used language expressing such an intent.

The pertinent facts in this case reveal the correctness of the aforesaid conclusion. The placing by the suppliers' advertising agencies of advertisements in Woman's Day was not concurrent with the beginning, or with the ending, of A & P stores' handling of each supplier's products on its shelves. The advertising charges paid by these suppliers were computed according to the same method used in fixing the charges to be paid by all advertisers in that publication. Defendant suppliers in no way dictated the editorial or other policies of Woman's Day. They did not manage or control the operation thereof. They did not have anything to do with the printing of the magazine or the furnishing of any paper or materials used in the magazine's publication. In short, defendant suppliers were simply buying an advertisement from Woman's Day, Inc. They were dealing at arms' length. They paid for the advertisement which they bought. They were not furnishing or contributing to the furnishing of any part of the production of the magazine. That production was exclusively a function of Woman's Day, Inc.

We, therefore, hold that the district court was correct in concluding that plaintiffs failed to prove a violation of § 2(e).

**2.** The essentially relevant language of § 2(d) is:

"It shall be unlawful for any person * * * to pay or contract for the payment of anything of value to or for the benefit of a customer of such person * * * for any services or facilities furnished by or through such customer in connection with the * * * sale, * * * of any products * * * sold, * * * by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products * * *."

Here is a rigid definition of acts constituting "unlawfulness". The *fact* of paying or contracting for the payment for the services or facilities referred to is proscribed, subject to the exception contained in the clause commencing "unless". It is apparent that Congress has not made relevant the motive or intent of him who thus pays or contracts to pay. United States v. E. I. Du Pont De Nemours & Co., 353 U.S. 586, 607, 77 S.Ct. 872, 1 L.Ed.2d 1057. We believe that the district court erred in relying upon the fact that it found that there was no evidence of any ulterior *motive* on the part of defendant suppliers in advertising in Woman's Day nor that said suppliers had *intended* to favor A & P over other customers. 154 F.Supp. at page 477.

The defendant suppliers paid, and contracted to pay, money to Woman's Day, Inc., a controlled subsidiary of A & P, for advertising in a magazine furnished by A & P in connection with the sale of products manufactured, sold, or offered for sale by said suppliers. § 2(d) made that transaction unlawful, unless such payment or consideration was available on proportionally equal terms to all other customers competing in the distribution of such products. In

838

effect, § 2(d) declares as a general rule what is unlawful and, by way of exception [9] to the rule (not as a condition thereof), provides for an escape from its applicability. The burden is upon the party who seeks the protection of the exception, to prove that it applies to the presented facts. Canadian Pac. Ry. Co. v. United States, 9 Cir., 73 F.2d 831, 834; Basham Co. v. Lucas, D.C., 21 F. 2d 550, 551, affirmed 30 F.2d 97; see, also, United States v. Dickson, 40 U.S. 141, 10 L.Ed. 689. Cf. Velde v. Rumbold, 7 Cir., 256 F.2d 163. This language required defendant suppliers to prove in the district court that the payments for advertising or alternative appropriate benefits were available on proportionately equal terms to all customers competing with A & P in the distribution of their said products. This they failed to do.

In Elizabeth Arden Sales Corp. v. Gus Blass, 8 Cir., 150 F.2d 988, at page 994, 161 A.L.R. 370, the court utilized the language of the Federal Trade Commission when it said:

"'* * * The furnishing of a service or facility which cannot be proportionalized for the benefit of competing purchasers or, in the alternative, the failure or refusal to proportionalize the terms upon which services or facilities are granted, so as to make it reasonably possible for competing purchasers to avail themselves of such services or facilities if they desire to do so, constitutes a failure to accord such services or facilities upon proportionally equal terms.'"[10]

The district court relied on the fact that [154 F.Supp. 482.] "none of the plaintiffs offers for sale a store magazine as apparently no such magazine is available for their distribution. * * * The question arises, therefore, whether the Act is violated if the one purchaser is unable to furnish a service which that purchaser's competitor furnishes and for which the common supplier makes payment. * * *". That court said:

"In the instant case, the plaintiffs do not publish or sell a store distributed magazine and, thus, they are unable and unequipped to render or furnish the services for which payment would be made and for which the defendant suppliers in this case pay Woman's Day. Being so unable to furnish these services, plaintiffs have no standing to complain about the defendant suppliers' advertising in Woman's Day even if it were assumed that these payments violated the Act. * * *"

Both sides in this case cite parts of the Report of the Attorney General's National Committee to Study the Anti-trust Laws, of March 31, 1955. On page 189 of the report, it is said:

"The criterion of 'proportionally equal terms' in Sections 2(d) and 2(e) has recently been construed by the Federal Trade Commission. In the recent Trade Practice Rules for the Cosmetics Industry and its opinion in the *Soap* cases, the Commission has evolved a rule of thumb for testing the requisite proportional equality in allowances or services by comparing the promotional benefit with the dollar volume of purchases by various customers. In actual practice, promotional programs can thus conform to the law in three basic ways: (1) payment of a dollar allowance per unit of promotional service rendered by each buyer, up to a uniform maximum precentage of his dollar volume; (2) a simplified plan, granting each buyer a set dollar allowance per unit of merchandise bought, on condition that *he* perform a specified minimum quantum of promotional services; (3) the *seller's* direct furnishing of promotional services to the buyer, worth a uniform percentage of each

9. "Unless" means "except". Webster's New International Dictionary (1957) 2d ed.

10. While the court was referring to a case before the Federal Trade Commission involving § 2(e), the quoted language is also applicable to § 2(d).

buyer's volume. The Commission's recent clarification of 2(d) and 2(e) also recognized that not all customers entitled to participation in a seller's promotional plan can effectively utilize each type of promotional service tendered, or perform that form of service which the seller desires to reward with an allowance under his plan. However, to ensure appropriate benefits to all qualified customers, the Commission expects the seller to offer *bona fide* alternative means enabling all buyers to participate in some form. In that event, a reasonable relationship among the several available types of service or allowance must be maintained, though the *rate* of compensation for different forms of service may vary. In this way, the statutory standard of proportional equality has been translated by the Commission into workable rules of law."

In determining the proportionally equal terms upon which a seller shall make available any payment or consideration referred to in § 2(d), the Act requires a frank recognition of the business limitations of each buyer. An offer to make a service available to one, the economic status of whose business renders him unable to accept the offer, is tantamount to no offer to him.

We, therefore, hold that the district court was in error in concluding that plaintiffs failed to prove a violation of § 2(d) by defendant suppliers.

■ 3. Defendants argue in this court that plaintiffs have failed to prove injury or "the fact of damage", as required by § 4 of the Clayton Act.[11]

Plaintiffs' counsel point out that the district court considered only the issue of defendants' liability under the Clayton Act and did not consider whether plaintiffs had established the "fact of damage or injury" under § 4. From an inspection of the record before us, we find

that the latter statement is correct. We also find that, not only did the district court separate the "issue of liability" from the "issue of damages", *ante 1,* but also that no objection appears to have been made to said action by any party hereto, either in the district court or in this court. The record does not show that the district court at any time made, or was asked to make, any finding of fact or conclusion of law, involving or resolving the issue of injury to the business or property of plaintiffs or their damages.[12]

■ It is elementary that this court, in the exercise of its appellate jurisdiction, will not pass upon any question as to which the district court, without objection of counsel for any party, failed to make a decision. Upon a remandment to that court, counsel have a right to ask for complete rulings on such a question.

4. Defendant suppliers make in this court a contention that plaintiffs have not shown that they are entitled to bring a class suit. The record reveals that the district court did not rule upon this contention. Upon a remandment it should do so.

For the reasons herein set forth, the judgment of the district court in favor of defendants A & P and Woman's Day, Inc., is affirmed, and, as to defendant suppliers, said judgment is reversed and, as to said defendant suppliers, this cause is remanded to that court for further proceedings not inconsistent with the views herein expressed.

Judgment in part affirmed and in part reversed and remanded with instructions.

FINNEGAN, Circuit Judge (dissenting).

I am unable to agree with all that is said by Judge SCHNACKENBERG in his opinion, and I differ with the majority in their disposition of this appeal.

---

11. 15 U.S.C.A. § 15.

12. The court made only a limited entry into this field. See findings of fact 171–174 and 176.