**M. O. DANTZLER, Appellant,**

v.

**DICTOGRAPH PRODUCTS, INC.,**
Appellee.

**No. 7951.**

United States Court of Appeals
Fourth Circuit.

Argued Nov. 3, 1959.

Decided Nov. 19, 1959.

John G. Golding, Charlotte, N. C. (William B. Webb, Charlotte, N. C., on the brief), for appellant.

O. W. Clayton, Charlotte, N. C. (Clayton & London, Charlotte, N. C., on the brief), for appellee.

Before SOPER and HAYNSWORTH, Circuit Judges, and R. DORSEY WATKINS, District Judge.

R. DORSEY WATKINS, District Judge.

Appellant, M. O. Dantzler (Dantzler) sued appellee, Dictograph Products, Inc. (Dictograph), the first count, alleging unlawful discriminations in violation of the Clayton Act, United States Code, Title 15, Section 13(d) and (e), and the second count alleging unlawful breach of contract, breach of confidential relations thereunder, and wrongful and malicious abuse by Dictograph of customer lists of Dantzler. At the conclusion of evidence on behalf of Dantzler, the District Judge withdrew the case from the jury, and entered judgment dismissing the case with prejudice. This appeal is only from the dismissal of the claim under the Clayton Act, the cause of action for breach of contract having been abandoned.[1]

---

1. At the argument on appeal, counsel for Dictograph stated, without challenge or contradiction, that Dantzler had originally sued Dictograph in the State courts for

The facts, construed most favorably for Dantzler, show that in March 1954 Dantzler and Dictograph entered into a contract, revised on September 1, 1954, under which Dantzler became the Charlotte, North Carolina, distributor for Acousticon hearing aids in 17 counties in North Carolina and four counties in South Carolina. Dantzler handled only Dictograph products, although the contract did not require him to deal exclusively in them. From March 1954 until April 1, 1957, Dantzler was the only formally appointed Dictograph representative in this territory assigned to him.

The September 1, 1954 contract provided that:

"8. This agreement may be terminated at any time with or without cause by either party hereto, by posting written notice thereof in the United States Registered Mail * * * "

The contract also provided that upon termination of the contract by either party, Dictograph might make and retain copies of Dantzler's lists or collections of names and addresses of users of Acousticons.

The agreement further provided that the distributor was an "independent business man and is not constituted and shall not be considered an employee or agent of" Dictograph.

On March 12, 1957, Dictograph sent a form letter to all Distributors, including Dantzler, stating that in order to conform with the requirements of the Federal Trade Commission, a revised Acousticon Distributor Franchise Agreement had been prepared. Two copies executed by Dictograph were enclosed, and the addressee was asked to sign and return one of them. This was a departure from previous practice, under which the Distributor signed first. The new agreement was identical with, or substantially similar to, the September 1,

1954 Agreement between Dantzler and Dictograph, but Dantzler did nothing about accepting or rejecting the new agreement until April 23, 1957.

In the early part of March, 1957, Dictograph approached Harold K. Green and Jerry K. Green, former Acousticon distributors but at the time selling other hearing aids in Charlotte, North Carolina, and negotiated with them, as a result of which a distributor agreement was signed by the Greens on March 27, 1957, and by Dictograph on April 1, 1957. This was in form similar to the Dantzler Agreement of September 1954, and covered the identical territory.

Dictograph prepared 2,900 copies of a letter dated March 25, 1957, (the so-called "Dear Friend" letter) signed by its Chairman of the Board, 1,344 copies of which were mailed at Dictograph's expense to users whose names and addresses were obtained from lists maintained by the defendant in its home office (which list included names and addresses of users who had been customers of the plaintiff) and to prospective users of Acousticon in the Charlotte area, announcing the "reappointment" [2] of the Greens as a distributor of Dictograph products. It also announced a hearing aid service clinic to be held on April 1, 2, and 3 in connection with the opening of the Green distributorship. The remainder of the letters were delivered to the Greens for their use. At least some of the letters contained notice of a special offer of batteries and receiver cords at less than the usual price during the clinic.

Dictograph also paid for four newspaper advertisements of the opening of the Green distributorship; and furnished free of charge to the Greens the services of one of its factory technicians to inspect, clean, adjust and make minor repairs to hearing aids brought to the

breach of contract; had voluntarily dismissed that suit, and then filed this suit in the United States District Court for the Western District of North Carolina.

2. Factually this was correct. To a prospective user, it might well connote a renewal, rather than a new appointment.

Greens' place of business on April 1 to 3, 1957.

Dantzler did not know of any of the negotiations or arrangements with the Greens until one of his customers brought him, on March 27, 1957, a copy of the "Dear Friend" letter.

On April 18, 1957, Dictograph sent Dantzler a formal notice of cancellation of his September 1, 1954 contract, under paragraph 8 thereof, and notice that the offer of a new contract under the March 12, 1957, letter had been withdrawn. On April 23, 1957, Dantzler replied, stating in part:

"So far as I am concerned our contract of September 1, 1954, was terminated long before you sent this letter by your breaking the contract through the appointment of another distributor and your actions connected with that appointment."

Dantzler claims that Dictograph's conduct is violative of United States Code, Title 15, Section 13(d) and (e) reading as follows:

15 U.S.C.A. § 13(d) "It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities."

15 U.S.C.A. § 13(e) "It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing, by contracting to furnish or fur-nishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms."

It is asserted by plaintiff that five discriminatory acts were committed, namely:

"(a) Furnishing to the said Greens the services of the chairman of its Board of Directors to promote the business of the said Greens, which service and facility was not offered or accorded the plaintiff.

"(b) Furnishing to the said Greens the services of its offices and staff and its letterhead paper to distribute letters promoting the business of the said Greens which services and facilities were not offered or accorded to the plaintiff.

"(c) Furnishing to the said Greens the services of a factory technician to clean and adjust hearing aids and to advise customers concerning repairs, all without charge to such customers or to the said Greens, which services were not offered or accorded to the plaintiff.

"(d) Paying to or for the benefit of the said Greens, advertising allowances for the promotion of their sales of the products of the defendant, which allowances were not made available on proportionately equal terms to the plaintiff.

"(e) Offering for sale and selling through the said Greens, receiver cords at one-half of the defendant's established list price and batteries at twenty per cent off of the established list price and giving to the said Greens such discounts or allowances as were necessary to enable such sales to be made."

It is necessarily admitted by Dantzler that under paragraph 8 of the September 1, 1954, contract Dictograph could at any time, as it did by the letter of April 18, 1957, validly terminate Dantzler's dis-

tributorship; and that, therefore, the critical period for the purpose of this suit is March 26, 1957—April 18, 1957.[3] Within that period Dictograph had two Charlotte distributors—Dantzler and the Greens.[4]

The evidence does not support the fourth and fifth alleged discriminatory acts. In April, 1957, Dantzler submitted to Dictograph tear sheets and advertising bills for newspaper advertisements for the month of March, 1957, and was reimbursed on a 50-50 basis. There is no evidence that Dictograph would not have paid for advertising by Dantzler, up to April 18, 1957, an amount equal to what it expended for the Greens; however unlikely this might be.

Also, there is no evidence that the sale of batteries and receiver cords at less

than list prices was an "offering for sale and selling through the said Greens". Nor is there any evidence that Dictograph gave the Greens "discounts or allowances * * * necessary to enable such sales to be made." The testimony of Harold K. Green was that he purchased merchandise from Dictograph in March 1957, prior to the opening of the Green distributorship.[5] Dantzler testified that "Very few hearing aids, I say very, very few hearing aids are sold at list prices at any time."

Literally, of course, it would have been impossible for Dictograph to have done for Dantzler exactly what it did for the Greens, since it could not have referred to Dantzler as a new distributor. However, the "Dear Friend" letter,[6] sent to all known users and prospective users of Acousticon, reads as if the Greens

3. There is no evidence or claim that the "Dear Friend" letter of March 25, 1957 was mailed before its date. As the mailing was from Jamaica, New York, and as one of Dantzler's customers brought in a copy on March 27, 1957, the earliest effective date would seem to be March 26, 1957.

4. Although as noted, the Greens did not sign their contract until March 27, 1957, and Dictograph did not accept until April 1, 1957, the case in this aspect must be viewed in the light most conceivably favorable to Dantzler.

5. An interrogatory propounded to Dictograph asked whether receiver cords for hearing aids were sold by Dictograph to the Greens in 1957 prior to April 1, 1957. The answer, offered in evidence by Dantzler's attorney, was:
"Yes, so as to be available for sale by Jerry K. Green and Harold K. Green at the Hearing Aid Clinic April 1, 2 and 3, 1957."

6. The letter, on the letterhead of Acousticon International, reads as follows:
"March 25, 1957
"Dear Friend:
"Acousticon takes great pleasure in announcing the reappointment of Harold K. Green and Jerry K. Green as Acousticon distributors in Charlotte, North Carolina. They are located at:—
"Carolina Hearing Aid Company
"Suite 503—Independence Building
"Corner Trade and Tyron Streets
"Charlotte, N. C.

"Telephone: Edison 4-7340
"Harold and Jerry Green have been associated in the hearing aid business for many years and due to the excellence of their scientific fittings they have built up a following of many satisfied hearing aid users in both North and South Carolina.
"Acousticon is famous for its complete line of hearing aids that incorporate all the latest scientic developments, including a great variety of powerful instruments that can be concealed on the head with no cords or any other parts to be worn on the body.
"To celebrate the opening, we have arranged for a factory trained technician to conduct a free hearing aid service clinic to be held for three days, Monday, Tuesday and Wednesday, April 1st, 2nd and 3rd. Regardless of the make or model of the hearing aid you are now wearing, take advantage of this opportunity now for free cleaning and adjustment of your hearing aid.
"The attached page gives you all the details of this free Hearing Aid Clinic and I urge you to read it thoroughly. Visit the Carolina Hearing Aid Company on Monday, Tuesday and Wednesday— April 1st, 2nd and 3rd—You will be glad you did."
"Sincerely,
"Dictograph Products, Inc.
"Acousticon Division
"Stanley Osserman
"Chairman of the Board"

were the only distributor in Charlotte; refers to the free hearing aid clinic to be conducted by the Greens on April 1, 2, and 3, at which any make or model hearing aid would be cleaned and adjusted free; and recommended that the reader visit the Greens "on Monday, Tuesday, and Wednesday—April 1st, 2nd and 3rd —You will be glad you did."

Moreover, the "attached page" again emphasized the "Free Hearing and Service Clinic"; and stated:

"Receiver Cords at Half Price ($1.00 per cord)

"Receiver cords for any make of hearing aid at half price these three days only. (Office sales only).

"Batteries 20% off List Price.

"Batteries for all makes of hearing aids at 20% off list price for these three days. (Office sales only)."

Proportional equality would have required that users and prospective users of Acousticon, circularized by Dictograph, should at least have been told that Dantzler was still a distributor (even if about to be terminated as such), and the addressee should not have been advised to visit only the Greens.

■ We accordingly hold that Dictograph discriminated against Dantzler by furnishing the Greens services and facilities connected with the handling, sale and offering for sale of commodities purchased from Dictograph, upon terms not "proportionally equal" to those accorded Dantzler. See Sun Cosmetic Shoppe, Inc. v. Elizabeth Arden Sales Corp., 2 Cir., 1949, 178 F.2d 150, 13 A.L.R.2d 358; Elizabeth Arden Sales Corp. v. Gus Blass Co., 8 Cir., 1945, 150 F.2d 988, 161 A.L.R. 370, certiorari denied 1945, 326 U.S. 773, 66 S.Ct. 231, 90 L.Ed. 467.

The existence of a count for breach of contract led to substantial confusion in the introduction below of evidence of alleged damage. As the judgment of the District Court must be reversed and the case remanded for a new trial on the Clayton Act count, Dantzler will be af-forded an opportunity to offer evidence as to pecuniary losses within the period March 26—April 18, 1957, resulting from Dictograph's discriminatory practices.

Reversed and remanded for a new trial.