**REYNOLDS v. HILL et al.**

**UNITED STATES v. HILL et al.**
(three cases).

**HILL et al. v. UNITED STATES.**

Nos. 13930–13933, 13938.

United States Court of Appeals
Eighth Circuit.

Sept. 11, 1950.

Rehearing Denied Nov. 6, 1950.

and C. C. Goodson, all of St. Paul, Minn., on the brief), for Louis W. Hill et al.

Harry Marselli, Special Assistant to the Attorney General (Theron Lamar Caudle, Assistant Attorney General, Ellis N. Slack, Special Assistant to the Attorney General, Melva M. Graney, Special Assistant to the Attorney General, John W. Graff, United States Attorney, and William P. Murphy, Assistant United States Attorney, St. Paul, Minn., on the brief), for Arthur D. Reynolds, Collector of Internal Revenue, and United States of America.

Before GARDNER, Chief Judge, and THOMAS and JOHNSEN, Circuit Judges.

JOHNSEN, Circuit Judge.

These appeals are from judgments entered in three suits instituted for refunds of income taxes, capital stock taxes and declared-value excess profits taxes, which had been assessed against an inter vivos trust as constituting an association and being engaged in doing business.[1]

The District Court held that the trust constituted an association, within 26 U.S. C.A. § 3797(a) (3)[2], and so had a liability for the income taxes, but that it was not engaged in doing business during the tax years involved and so had no liability under 26 U.S.C.A. §§ 1200(a) and 600(a), respectively, for the capital stock taxes and the declared-value excess profits taxes. The court's opinion is reported in 75 F. Supp. 408.

The trustees of the trust have appealed from the denial of refund of the income taxes, and the Government[3] has appealed

Pierce Butler, St. Paul, Minn. (Irving Clark, Doherty, Rumble, Butler & Mitchell

1. The income taxes involved are for the years 1938 to 1944 inclusive and amount to $387,766.90; the capital stock taxes are for the years 1936 to 1943 inclusive and amount to $25,413.20; and the declared-value excess profits taxes are for the years 1939, 1940 and 1942, and amount to $16,999.23. The latter two forms of taxes were abolished by the Revenue Act of 1945, § 201, 26 U.S.C. A.Int.Rev.Acts, page 579.

2. For convenience, reference is made here to the sections of the Internal Revenue Code instead of to the substantially corresponding provisions of the specific Revenue Acts involved.

3. In one of the suits, involving capital stock taxes, the Collector of Internal Revenue of the District of Minnesota was the defendant and is the appellant here. In the other two actions, the United States was the defendant and is the appellant here as to the capital stock taxes and the declared-value excess profits taxes, because the Collector to whom the payments had been made was out of office, 28 U.S.C.A. § 41(20) [Revised 28 U.S.C.A. § 1346]. For convenience, both the Collector and the United States are referred to above as the Government. The appeal taken by the trustees as to income taxes is in one of the actions in which the United States was defendant.

from the granting of refunds of the capital stock taxes and the declared-value excess profits taxes.

We examine first the question whether the trial court was in error in holding that the trust sufficiently constituted an association, within 26 U.S.C.A. § 3797(a) (3), to make its income taxable as that of a corporation.

 The tests for determining whether a trust constitutes an association for income tax purposes have been reviewed by us in the recent case of Nee v. Main Street Bank, 8 Cir., 174 F.2d 425, with citation of the controlling authorities. As we there said, a trust may be so classified, when it has been created as a vehicle for conducting a business enterprise or has been made generally to serve as such a vehicle during the tax years involved, and when in addition its structure is analogous in characteristics or advantages to a corporate form. If the trust declaration or agreement on its face contains powers which, if exercised, necessarily would cause a business enterprise to result, this will taxwise be regarded as conclusive of entrepreneurial purpose. If the powers are not thus conclusive on their face, the setting and circumstances of the trust's creation, or the manner and extent that the powers have shown themselves capable of being utilized by the trustees in actual operation, may serve to throw light on their real nature and to bring clearly into focus the entrepreneurial object or capacity of the trust.

We need not here repeat the aspects of resemblance which a trust supportively also must have to a corporate structure, since concededly these elements were sufficiently existent in the present situation to support taxability as an association, if the trust had an entrepreneurial object or nature.

The contention of the trustees is that their only powers under the trust instrument were to hold the corporate stocks which were the subject of the trust (or such substitute property as might come into their hands from reinvestment), receive the dividends thereon, distribute the proceeds to the beneficiaries, and perform simply such incidental acts as might be necessary or would be facilitative in the accomplishment of these limited and conventional trust ends—or in other words that the trust here was in effect a mere conduit, with no intended powers except those of distribution, reinvestment and the ordinary incidents of their accomplishment.

The trust was one which had existed for more than 40 years. It was created in 1906, for the period of the lives in being of 18 named persons and 20 years after the death of the last survivor, to take over the ownership of all the capital stock of eight corporations, 90.61 per cent of the capital stock of a ninth corporation, and 50 per cent of the capital stock of a tenth corporation—of which capital stock the shareholders of the Great Northern Railway Company had been for some time the beneficial owners. The stock thus taken over by the trustees had an aggregate par value of $1,738,000. The shareholders of the Great Northern Railway Company, on the basis of their pre-existing rights, were to constitute the beneficiaries of the trust, and certificates of beneficial interest in the amount of 1,500,000 shares, corresponding to the outstanding stock of the Railway Company, were issued to them by the trustees. Under the trust instrument, these shares of beneficial interest were, however, to be given a transferability disassociated from continued ownership of the Railway Company stock, and the trustees were required to make provision for registration of the certificates. They were also required to appoint a corporation as Registrar of Transfers, and the Bankers Trust Company of New York was so appointed. The trust came to be known in mining and financial circles as the Great Northern Iron Ore Properties Trust, and its certificates of beneficial interest were listed and traded on the New York Stock Exchange.

The ten corporations (later reduced by dissolution, reorganization, etc., first to nine and then to seven), whose stock constituted the corpus of the trust, were engaged in the business of owning mineral lands and interests in the State of Minnesota, making leases with mining companies for the mining of iron ore upon such properties

on a royalty basis, and keeping check by means of a staff of engineers and other personnel on the manner and extent of the carrying on of the mining operations. Because of the necessity of joining properties of the several corporations in the making of advantageous leases and in the conducting of practical mining operations by the lessees, as well as in view of the interrelation of the corporations to each other in the trust holding of their stock, nine of the corporations appointed the tenth as their fiscal agent, and this corporation, through a staff of 32 employees, performed the tasks of doing the necessary checking on the mining operations as to all the properties and of collecting the royalties due each corporation on the leases.

At the time the trust was created, the ten corporations owned or controlled the mineral rights in an aggregate of 49,000 acres of land, and had an undivided one-half interest in an additional 16,000 acres. These holdings had been reduced by 1944, through exhaustion of ore, tax forfeitures of unprofitable properties, etc., to approximately 23,000 acres. From 1906 to 1944, the trustees distributed to the beneficiaries, from income received by the trust from the ten corporations, over $97,000,000, in addition to paying the expenses of the trust (including the taxes here involved) amounting to some $2,640,000.

The trust instrument designated four named persons as trustees, with provision for the filling of any vacancies that might occur. The trustees were to select one of their number as "president," who was to be the "active manager and executive officer in carrying on the business devolving on the trustees." This trustee was to be paid the sum of $25,000 a year for his services, with a graduated extra allowance in case the gross income of the trust exceeded $5,000,000 in any year. The compensation of the three other trustees was fixed at the flat sum of $10,000 each per year.

The powers of the trustees were set out in the trust instrument in numbered paragraphs of which the first read: "1. The trustees hereunder shall, while holding said shares of stock [of the ten named corporations] or any of them of any such corpora-

tions, use and exercise their powers as such shareholders to preserve the existence and the organization of such corporation, and to secure at all times proper management of the property and business and affairs of such corporation."

Another paragraph authorized the trustees "to hire such suitable offices and employ such clerks, attorneys, mining engineers and other agents or other persons as they may deem requisite for the proper execution of this trust." It was further provided that "The trustees, for the better accomplishment of the purposes hereof, may, from time to time, adopt rules not inconsistent with the provisions hereof for the management of said trust and the government of their proceedings." Other paragraphs in the instrument contained powers which might, when read abstractly, be regarded as simply those of an ordinary trust.

The question here turns upon the provisions which have been quoted or summarized above, subject to the right, as heretofore indicated, in appraising their object or nature, to scrutinize them in the light of the setting and circumstances involved in the constituting of the trust and also the manner and extent that the powers conferred upon the trustees have shown themselves capable of being utilized in actual operation.

It was the trial court's view that the Commissioner had been warranted in classifying the trust as one created for business or profit-making purposes. On all the elements of the situation, we think that conclusion was not merely proper but compelled as well.

The setting and circumstances present the picture of large interrelated holdings of mineral lands, which had been amassed for the purpose of making additional earnings for the stockholders of the Great Northern Railway Company and of being the source of hauling revenues for the Railway itself. On such a control of natural resources by a carrier, Congress in 1906 laid its restraining hand, through the enactment of the Hepburn Act, 49 U.S.C.A. § 1(8), and the Great Northern Railway was faced with the situation of having to divorce itself

from connection with these holdings. Those who had control of the Railway undertook the task of creating a set-up, which would leave the Hepburn Act unviolated and which, it is reasonable to assume, would also permit the properties to serve as nearly as possible their initially intended purposes.

Thus, one naturally would expect to find created in the situation a set-up that would give control of the properties to friendly hands and that would enable this control to be made exploitatively effective. Certainly, it would hardly be suggested that either the stockholders or the Railway had lost interest in these revenue objects. And there was at that time (1906), no question of income taxes to act as a deterrent to granting powers in connection with any set-up made.

There is therefore an impressing significance, on reading the trust instrument, to find that the trustees (back in 1906) were to be paid salaries of $25,000 and $10,000 a year; that the $25,000 trustee was to be "president" and was to serve as "active manager and executive officer in carrying on the business devolving on the trustees;" that, as the revenues of the trust were caused to grow, the $25,000 salary of this "active manager" was to be increased until it reached a $50,000 level; that provision was made for establishing suitable offices and hiring "clerks, attorneys, mining engineers and other agents or other persons * * * requisite for the proper execution of this trust;" and that the trustees, so long as they held the stock of any of the mineral-land corporations, should "use and exercise their powers as such shareholders to preserve the existence and the organization of such corporation, and to secure at all times proper management of the property and business and affairs of such corporation."

The trustees argue that the phrase "as such shareholders" in the provision last quoted necessarily meant that they had no powers, duties or responsibilities with respect to the mineral-land corporations except as a general stockholder. But the language of the provision, "to preserve the existence and organization of such corporation, and to secure at all times proper management of the property and business and affairs of such corporation," especially when read in the light of the setting and circumstances of the trust and in relation to the other provisions of the trust instrument, stands out with an emphasis which does not entitle it to be suppressingly said that the whole thing was intended merely as a formal reminder to the trustees to attend the regular annual meetings of stockholders. The phrase "as such stockholders" therefore impresses, not as being a technical, limitative term in the situation, but as representing simply incidental or casual expression.

And this view is fortified and brought into sharper focus by the reading which the trustees themselves have made of the provision and their exercise of power under it. They have at all times regarded themselves as having the duty and right to exercise a directing hand in the policies, interrelationships and affairs generally of the mineral-land corporations. Their minutes as trustees contain many formal instances of such action, as for example, determining and handling questions of modifications of royalty rates in existing leases, considering and acting by resolution upon the reorganization of some of the mineral-land corporations and the basis thereof, et cetera, et cetera. And these services were of high-level value to the corporations, for the latter paid the trust therefor the sum of $48,000 each year, which amount had been approved as reasonable by the Internal Revenue Bureau for income tax deduction purposes. Thus, of the $55,000 worth of time and effort for which the trustees were compensated by the trust, a $48,000 part was devoted by them directly to the affairs of the corporations.

The trust therefore clearly was engaged in the activity of supplying its controlled corporations with directional and policy-making services, for which it was compensated by the corporations. And on all the elements of the situation, as previously set out, the conviction seems to us inescapable that this is what it was intended, in the pecuniary interest of the beneficiaries, that

the trustees should have the power to do and what they were expected to do.

There are other matters also indicative of the direct relationship of the trust to the conduct of the operations and affairs of the corporations. Thus, the trust purchased approximately 2,400 acres of land immediately adjacent to the mining properties for use in the incidents of the mining operations. Again, throughout all the years, the financial affairs of the mineral-land corporations always were made to appear consolidatedly, in a report which was prepared by the trustees. And it also may be observed that the Minnesota Supreme Court, for other purposes under the statutes of Minnesota, said of the identical trust instrument here involved that it had created a business association. Venner v. Great Northern Ry. Co., 108 Minn. 62, 121 N.W. 212.

■■ Since, as we have said, the trust was more than a simple or ordinary trust and constituted a business association, it necessarily follows that it had a liability for income taxes. The trial court's denial of a refund of these taxes is accordingly affirmed. While the trustees have argued that some of the reasons which the trial court gave for its holding are not sound, it is unnecessary to consider that question, because a correct judgment is entitled to be affirmed upon appeal, even though the trial court may not have given a proper reason for its action. Olson v. United States, 8 Cir., 175 F.2d 510, 512; Springfield v. Carter, 8 Cir., 175 F.2d 914, 917; Elizabeth Arden Sales Corp. v. Gus Blass Co., 8 Cir., 150 F.2d 988, 993, 161 A.L.R. 370.

■ The facts and views which have been set out above, however, also require the holding that the trust was engaged in "carrying on or doing business" within the meaning of 26 U.S.C.A. § 1200 (a) during the years involved, and so had a liability for capital stock taxes and declared value excess profits taxes, and that the trial court therefore erred in granting refunds of these taxes. Furnishing directional or policy-making services to a business enterprise plainly constitutes a business activity. Cf. Treasury Regulations 64, Article 43. And

any corporation or association which acts as a "brain" for the activities of even a subsidiary is for federal tax purposes engaged in carrying on or doing business. Edwards v. Chile Copper Co., 270 U.S. 452, 46 S.Ct. 345, 346, 70 L.Ed. 678.

The trustees argue that since their minutes do not show any actions taken by them in relation to the affairs of the mineral-land corporations for the years from 1940 on, this part at least of the refund of capital stock taxes and declared-value excess profits taxes allowed by the trial court should not be disturbed. But the mere circumstance that no such actions are recorded in the trustees' minutes for this period could hardly have weight realistically against the fact that the trust was paid $48,000 during each of these years for services which the trustees had so rendered.

The judgment denying refund of income taxes is affirmed, and the judgments granting refunds of the capital stock taxes and declared-value excess profits taxes are reversed.