**Charles B. HOWARD and Dorothy L. Howard, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 615–80T.**

United States Claims Court.

May 15, 1984.

Charles O. Howard, Minneapolis, Minn., for plaintiffs.

Israel D. Shetreat, Washington, D.C., with whom was Asst. Atty. Gen., Glenn L. Archer, Jr., Washington, D.C., for defendant.

OPINION

REGINALD W. GIBSON, Judge:

In this joint tax refund suit, plaintiffs, Charles B. and Dorothy L. Howard, seek the return of $419[1] in individual income taxes plus interest for their taxable year ending December 31, 1979. Jurisdiction in this court is premised on section 1491, 28 United States Code.

In 1979, distributions totalling $1,125 were received by plaintiffs from the Great Northern Iron Ore Properties (GNIOP), an express trust, which amount they allege to have erroneously reported on their joint return as a dividend (i.e., ordinary income). Plaintiffs' refund claim is propounded on the theory that GNIOP should properly be classified as an "ordinary trust" under

---

1. While *this* action only involves a $419 refund claim, the issues are of great importance inasmuch as similarly situated taxpayers have ap-parently filed claims for refund approximating $3,000,000, pending this decision.

Treas.Reg. § 301.7701–4(a). In such case distributions received therefrom are taxed at the rates applicable to capital gains rather than at ordinary income tax rates on dividends.

The parties have filed cross-motions for summary judgment, supplemented by extensive affidavits and other documentation, and jointly aver that this case is ripe for decision inasmuch as there is no genuine issue of material fact. The central issue is, therefore, whether GNIOP should be classified, for tax purposes, as an "ordinary trust" or as an "association" taxable as a corporation under the 1954 Internal Revenue Code (I.R.C.) and applicable regulations. The court observes that more than 30 years ago, the trustees of GNIOP instituted a refund suit in the federal courts in Minnesota for the trust's taxable years 1938 through 1944 raising the identical issue there—"whether ... the trust ... constituted an 'association' ..."—that is raised here by plaintiffs (as beneficiaries thereof). *See Hill v. Reynolds,* 75 F.Supp. 408 (D.Minn.1948); *aff'd, Reynolds v. Hill,* 184 F.2d 294 (8th Cir.1950).[2] An extensive factual history of GNIOP is set forth in *Reynolds v. Hill,* 184 F.2d at 296. So far as here material, the operative facts are set forth hereinafter therefrom, and from the submissions of the parties. For the reasons expressed below, defendant is entitled to summary judgment, plaintiffs' cross-motion for summary judgment is denied, and the petition is to be dismissed.

FACTS

In the mid-1940's, plaintiffs purchased 300 share certificates in GNIOP. They reported the income received in 1979 from GNIOP, with respect to said certificates, as dividends. A petition for refund was subsequently filed in this court. Said petition avers that plaintiffs incorrectly included the $1,125 distribution on their 1979 tax return as a dividend in that GNIOP is an "ordinary trust," and not an "association" taxable as a corporation.

Plaintiffs' theory posits that royalties from iron ore mining received by the trust and distributed would be taxed to the beneficiaries of the trust as a pass-through at the rates applicable for long-term capital gains. Conversely, if plaintiffs' contentions are misplaced, distributions through GNIOP to the plaintiffs (as beneficiaries) would be taxed as dividends at ordinary income tax rates. See I.R.C. §§ 301, 316.

The principal issue in this case, therefore, is whether GNIOP in 1979 was an "association" under § 7701(a)(3), I.R.C. and Treas.Reg. § 301.7701–1 through § 301.-7701–4, and thus taxable as a corporation.

The genesis of GNIOP antedates the 1900's, when James J. Hill and several individuals acquired stock in ten corporations which owned properties situated on the Mesabi Range in Minnesota containing substantial deposits of iron ore. Nine of the ten corporations were engaged in the business of owning mineral lands, and interests therein, in the State of Minnesota, making leases with mining companies for the mining and extraction of ore from such properties on a royalty basis. Because of the intricacies of the interrelationships between the entities, these nine corporations appointed the tenth corporation as their fiscal agent, which, through a staff of 32 employees, performed the full range of administrative functions for all nine entities respecting their business, including collecting the royalties due each entity and keeping check by means of a staff of engineers and other personnel on the manner and extent

---

**2.** The petition in this case was filed in the predecessor United States Court of Claims on November 17, 1980, and transferred to the United States Claims Court pursuant to section 403(d) of the Federal Courts Improvement Act of 1982, 28 U.S.C.A. § 171. Defendant's answer and first amended answer were filed on May 31, 1981, and June 12, 1981, respectively. In defendant's first amended answer, the affirmative defense doctrine of collateral estoppel was raised, premised, of course, on *Reynolds v. Hill, supra.* However, by motion dated January 7, 1982, defendant withdrew its affirmative defense on the terse instructions from the Internal Revenue Service "not to pursue." The Trial Judge of the predecessor court granted said motion of "permanent withdrawal" on January 25, 1982.

of the carrying on of mining operations by its lessees.

In 1899, James J. Hill caused said stock to be transferred to the Lake Superior Company, Limited (Lake Superior), a Michigan partnership composed of Hill and his associates,[3] "for the benefit of stockholders of the Great Northern Railway Co." (the Railway). Lake Superior was thereafter used as a holding company, or as a trust vehicle, to hold the stock in said entities which owned ore properties and interests therein comprising some 65,000 acres. This transfer occurred on or about October 20, 1899, and concomitantly therewith Lake Superior entered into an agreement with the Railway, whereby the former agreed not to sell any of said stock without the approval of the Railway; to pay when directed by the Railway the net income from the stock held by Lake Superior to the shareholders of the Railway or their assigns; and to acquire new property and to transfer its property to whomever the Railway designated by resolution of its Board of Directors and approved by its stockholders of the Railway. Consistent with the foregoing, on or about November 14, 1906, the Railway, by resolution passed by its Board of Directors and approved by its stockholders, directed Lake Superior to transfer the foregoing shares of stock in the ten entities to four named trustees.[4] The trust in issue, *i.e.*, GNIOP, was thus created by a Trust Agreement dated December 7, 1906. It was executed by Lake Superior, as settlor, and the four named individuals, *supra*, as trustees who "[held] the [corpus] for the benefit of the shareholders of the Railway."

Basically, there were several pragmatic reasons for the creation of the trust, foremost of which were the following:

(i) the Railway held no charter powers permitting it to own and operate an interest in ore mines;

(ii) the Railway wished to avoid violating the Hepburn Act, 49 U.S.C. § 1(8), which prohibited a railroad company from transporting commodities owned by it; and, concomitantly, it wished to assure that its stockholders would continue to benefit from the royalties received from leasing the lands; and

(iii) the Railway wished to continue to obtain the freight revenues from transporting the ore.

The GNIOP Trust Agreement has remained intact and *unmodified* since its creation in 1906, and provides that the trust shall continue in effect for the period of the lives in being of 18 named persons plus 20 years after the death of the last survivor.[5] The Agreement contains 18 numbered paragraphs setting forth its provisions, which are paraphrased hereinafter:

Paragraph 1 provides, "The trustees hereunder shall, while holding ... stock ... of any of ... [the mineral land] corporations, use and exercise their power as such shareholders to preserve the existence and the organization of such corporation, and to secure at all times proper management of the property and business and affairs of such corporation."

Paragraph 2 empowers the trustees to collect and receive all dividends, income, profits, or other moneys to which they are entitled as holders of the trust corpus.

Paragraph 3 obligates the trustees to pay, out of moneys received, all expenses of the trust including taxes and their compensation.

Paragraph 4 obligates the trustees, at least annually, to distribute and pay such portion of the net income or proceeds of property held as trustees, as they deem proper, to the shareholders of record of the Railway as of December 6, 1906.

---

3. The partnership (formed July 1899) was composed of James J. Hill, president, Great Northern Railway Company, James N. Hill (his son), and R.I. Farrington, vice-president and comptroller of the Railway.

4. The named trustees were Louis W. Hill, James N. Hill, Walter J. Hill, and Edward T. Nichols.

5. In 1982 only one of the named 18 persons was alive; thus the trust will continue by its terms until at least the year 2002.

Paragraph 5 provides that the interest of the trust beneficiaries shall consist of 1.5 million equal shares, and each shareholder of the Railway is to receive a certificate for the number of shares, as a beneficiary, equal to the shares owned in the Railway on December 6, 1906.[6]

Paragraphs 6, 7, and 8 provide, *inter alia,* that such beneficiary rights in distributions shall be proportioned; that the certificates shall be assignable and registered on the books of the trustees, and that a Registrar of Transfers and a transfer agent shall be appointed.[7]

Paragraph 9 empowers the trustees "to sell at public or private sale, or exchange for other property,, or ... dispose of any ... property [corpus] ... and invest the proceeds" therefrom; and such received property shall be held "by the trustees under the same trust and with the same powers and duties in respect thereto as are hereby provided in respect to the property herein described and conveyed."

Paragraph 10 empowers the trustees to hire offices, employ clerks, attorneys, mining engineers, and other agents or other persons as they deem requisite for the proper execution of the trust. Such expenses and all other charges incurred in executing the trust shall be a charge against income or other moneys *before* a division and distribution to the beneficiaries.

Paragraph 11 requires the trustees to keep books of account of receipts and expenses "and business transactions in the execution of the trust," including an annual report of receipts and disbursements.

Paragraph 12 permits any trustees to resign and any vacancy may be filled by the remaining trustee(s); however, under certain circumstances, the Board of Directors of the Railway is empowered to fill such a vacancy.

Paragraph 13 authorizes the trustees to choose one among them as president, who shall be the "active manager and executive officer in *carrying on the business devolving on the trustees.*" The compensation of the president is $25,000 per year until the gross income of the trust is $5 million, after which it increases by one percent of the excess over $5 million, with a "cap" of $50,000. The compensation of the other trustees is limited to $10,000 per year, without any incentives.

Paragraph 14 empowers the trustees to adopt rules "not inconsistent with the provisions hereof for the management of said trust."

Paragraph 15 limits the trustees' liability to only *willful breach* of the trust, and each shall be responsible *only* for his own acts and default.

Paragraph 16 defines "trustees" as "those who may at any time be trustees hereunder."

Paragraph 17 provides that upon the expiration of the term of the trust the trustees shall wind up its affairs, and after paying all expenses, they shall ratably distribute all moneys to the certificate holders (income beneficiaries) and convey and transfer to Lake Superior or its assigns "all property, save said money."

Paragraph 18 provides that the trustees accept the transfer and the expressed trust.

In 1913, Lake Superior, the settlor, transferred its reversionary interest in the trust corpus (paragraph 17) to the Railway, and in 1970 Burlington Northern Inc., pursuant to a merger, acquired the Railway's interest as its successor.

From 1917 through 1919 GNIOP paid income taxes as an "association" taxable as a corporation. (These taxes were later refunded pursuant to an IRS ruling, received by the trust, that it was taxable as a

---

6. Although no statements are in the record concerning the number of certificate holders *in 1906,* the record shows that this number was approximately 10,000 in the early 1970's and 6,924 in 1979.

7. The trust certificates were listed and traded on the New York Stock Exchange, and the trust filed Annual Form 10–K with the Securities and Exchange Commission.

"trust." S. 1205, C.B. 1, 7 (1919).) From 1920 to 1942, therefore, the trust filed its income tax returns as an organization taxable as a "trust" and not an "association." Subsequently, in 1942, the Treasury reversed its position and ruled, retroactively to 1938, that GNIOP was taxable as a corporation. *See* G.C.M. 23061, 1942–2 C.B. 159. This ruling was premised on a series of United States Supreme Court decisions issued in 1935, which effectively overruled the earlier Treasury ruling on the tax status of GNIOP. *See Morrissey v. Commissioner*, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263 (1935); *Swanson v. Commissioner*, 296 U.S. 362, 56 S.Ct. 283, 80 L.Ed. 273 (1935); *Helvering v. Combs*, 296 U.S. 365, 56 S.Ct. 287, 80 L.Ed. 275 (1935); *Helvering v. Coleman-Gilbert Assocs.*, 296 U.S. 369, 56 S.Ct. 285, 80 L.Ed. 278 (1935). The trustees of GNIOP then challenged, *inter alia*, the application of the foregoing Treasury ruling respecting the trust's tax status for taxable years 1938–1944 in the federal district court in Minnesota. The district court upheld the Treasury ruling that GNIOP was an "association" taxable as a corporation. *See Hill v. Reynolds, supra*. This holding was affirmed by the Eighth Circuit in *Reynolds v. Hill, supra* (cited hereinafter as *Reynolds*). In affirming, the Court of Appeals noted a number of paragraphs in the Trust Agreement, especially paragraph 1, that indicated that facially GNIOP contained a preponderance of corporate characteristics. 184 F.2d at 297. The court then examined the "setting and circumstances" of the formation of GNIOP, noting, *inter alia*, that the trust was created from stock of an on-going business as a "set-up" to avoid violating the then recently-passed Hepburn Act.[8] Against the foregoing background, the court found that this set-up "would also permit the [mining] properties to serve as nearly as possible their initially intended [business] purpose." *Id.* at 298. Consequently, the court stated as follows:

> It was the trial court's view that the Commissioner had been warranted in classifying the trust as one created for business or profit-making purposes. On all the elements of the situation, *we think that conclusion was not merely proper but compelled as well.*[9]

*Id.* at 297. (Emphasis added.)

From 1906 through 1956, the trustees retained the stocks of the corporations, *i.e.*, the corpus, transferred to the trust in 1906, and continued to exercise an active part in the affairs of the corporations' business (leasing mineral lands to lessees) by, *inter alia*, providing directional and policy-making services. In 1956, however, the trustees decided to "liquidate" the seven remaining proprietary corporations (reduced for dissolution, reorganization, etc. from the ten existing in 1906) of GNIOP. According to the 1956 Annual Report of GNIOP, the liquidation was effected because of the repeal of a Minnesota statute that had limited holdings of corporations to 5,000 acres (thereby leaving "no material business purpose" for the bifurcated corporate arrangement). Additionally, the liquidation was recommended by the trustees because it simplified leasing arrangements, avoided duplicitous actions, and generated administrative economies, *i.e.*, with respect to management, accounting and auditing services. Accordingly, in December 1956, title to the mineral lands and other assets and interests of said corporations passed to the trustees in exchange for their stock, to

---

8. The pertinent "commodities clause" of the Hepburn Act, 49 U.S.C. § 1(8), prohibits railroads from transporting any commodities (except for timber products) across state lines that are manufactured, mined, or produced by them.

9. In deciding the *Reynolds* case, the court further stated, in referencing its holding in a prior case, *Nee v. Main Street Bank*, 174 F.2d 425 (1949), that "a trust may be so classified, when it has been created as a vehicle for conducting a business enterprise or has been made generally to serve as such a vehicle, ..., and ... its structure is analogous in characteristics or advantages to a corporate form. If the trust declaration *on its face* contains powers which, if exercised, necessarily would cause a business enterprise to result, *this will taxwise be regarded as conclusive of entrepreneurial purpose.*" (Emphasis added.) 184 F.2d at 296.

be held by them directly in trust, and certificates of dissolution were filed and issued for the remaining seven corporations. The 1956 Annual Report of the trust, corroborated by the uncontroverted deposition of one of GNIOP's trustees (Mr. W.W. Watson, president of the trust), stated that as a result of the liquidation, *"[t]here has been no change* in the real estate and mineral interests owned by the Trustees, *in the management of the properties,* or in the equity value represented by Certificates of Beneficial Interest." (Emphasis added.)

The corpus of the trust, since the 1956 liquidation, has therefore consisted primarily of an interest in 65,000 acres of mineral lands located in northern Minnesota. Approximately 12,000 of these acres are situated on the Mesabi Iron Formation (approximately 7,400 acres of which are wholly owned and 4,600 acres are partially owned). The remaining 53,000 acres of mineral lands are contiguous to, but not on, the iron formation, and it is not anticipated that they will produce royalty income until after the termination of the trust and transfer of the corpus to the reversionary beneficiary.

The trustees have made no purchases or sales of mineral lands since 1956, except pursuant to a January 1, 1959 agreement with one of their lessees, the United States Steel Corporation. The trust owns no equipment for the extraction or processing of iron ore (actual extraction is the business of the lessees). It is further evident from the record that in 1979:

(i) The trust maintained two offices: (a) the St. Paul office had a staff of six persons, including the president, secretary, two accountants, and clerical staff. Centered thereat are the general trust administration and office functions; (b) the Hibbing, Minnesota office (situated on the Mesabi Range) consisted of a staff of seven persons, including engineering and clerical staffs. Oversight supervision of the trust mineral lands is performed in this office.

(ii) According to GNIOP's 1979 and 1980 Annual Reports, the trustees were "involved solely with the leasing and maintenance of mineral lands owned by the Trust" during said years. This activity constituted the principal source of the trust's income.[10]

(iii) The trust "has been engaged in only one line of business for the last five years, namely, the leasing and maintenance of its mineral properties." (Statement contained in the trust's Annual Report on Form 10-K, December 31, 1979, filed with the Securities and Exchange Commission.)

(iv) The trust had in effect 24 long-term leases with mining companies, embracing 10,793 acres of mineral lands. Ore was extracted from 11 of said mines in 1979.

(v) The trustees' most important activity is the negotiation of new lease agreements and extensions to expiring lease agreements.

(vi) While the lessees have possession and control over leased property, insofar as whether and where to mine, the trustees' responsibility requires continuous monitoring and inspection of the leased mineral lands to assure strict adherence by lessees, to the terms of the lease.

(vii) Thus, a major activity of the engineering staff at the Hibbing office is to inspect the lessees' operations at the active mines to confirm compliance with the lease. This inspection is performed on a daily basis by employees to assure that royalties due the trust are properly computed and allocated to the various interests. Additionally,

(viii) The Manager of Mines and Chief Engineer, employed at the Hibbing office by the trust, is required to submit monthly reports to the trust on the activity and production at each of the active mines.

## DISCUSSION

If GNIOP was an "association," as defined in the I.R.C. and applicable regula-

---

**10.** From its inception to 1944, the trust has distributed income to the beneficiaries in the approximate amount of $97,000,000; disburse- ments to the beneficiaries in the years 1975 to 1980 aggregated slightly over $19 million, or an average of more than $3 million each year.

tions, as of the end of the 1979 taxable year, then the Service properly taxed plaintiffs' distributions from GNIOP as a dividend at ordinary income tax rates. The only guidance provided on this question by the I.R.C. is the definition of "corporation" in § 7701(a)(3), which reads, "The term 'corporation' includes associations, joint-stock companies, and insurance companies." A definition of the term "association" is found in Treas.Reg. § 301.7701–2(a) (1979), however, which provides, in pertinent part:

(a) Characteristics of corporations. (1) The term "association" refers to an organization whose characteristics require it to be classified for purposes of taxation as a corporation rather than as another type of organization such as a partnership or a trust. There are a number of major characteristics ordinarily found in a pure corporation which, taken together, distinguish it from other organizations. These are:

(i) Associates, (ii) an objective to carry on business and divide the gains therefrom, (iii) continuity of life, (iv) centralization of management, (v) liability for corporate debts limited to corporate property, and (vi) free transferability of interests. Whether a particular organization is to be classified as an association must be determined by taking into account the presence or absence of these characteristics. The presence or absence of each of these characteristics will depend upon the facts in each individual case. In addition to the major characteristics set forth in this subparagraph, other factors may be found in some cases which may be significant in classifying an organization as an association, a partnership, or a trust. *An organization will be treated as an association if the corporate characteristics are such that the organization more nearly resembles a corporation than a partnership or trust.* See *Morrissey et al. v. Commissioner* (1935) 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263.

(2) ... Some of the major characteristics of a corporation are common to trusts and corporations, ... [which] are not material in attempting to distinguish between a trust and an association, .... For example, *since centralization of management, continuity of life, free transferability of interests, and limited liability are generally common to trusts and corporations, the determination of whether a trust which has such characteristics is to be treated for tax purposes as a trust or as an association depends on whether there are associates and an objective to carry on business and divide the gains therefrom ....*

(Emphasis added.)

The parties agree that the latter four corporate characteristics listed in § 301.-7701–2(a)(1), *i.e.*, factors (iii)–(vi), obtain for GNIOP. Consequently, pursuant to § 301.-7701–2(a)(2), GNIOP's tax status for the year 1979 depends exclusively on whether it has (i) associates *and* (ii) an objective to carry on business and divide the gains therefrom. Each of the foregoing obligatory factors, introduced into the regulations in their current form in 1960, were derived from the landmark case of *Morrissey v. United States*, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263 (1935).

1. *Associates.*

 In determining the meaning of the term "association," as included by Congress in the I.R.C.'s definition of "corporation," the Supreme Court stated in *Morrissey* that:

"Association" implies associates. It implies the *entering into of a joint enterprise ... for the transaction of business.* This is not a characteristic of an ordinary trust—whether created by will, deed, or declaration—by which particular property is conveyed to a trustee or is to be held by the settlor, on specified trusts, for the benefit of named or described persons. Such beneficiaries do not ordinarily, and as mere *cestuis que trustent, plan a common enterprise or enter into a combination for the conduct of a business enterprise.*

296 U.S. at 356–57, 56 S.Ct. at 294–95. (Emphasis added.) *Morrissey* has been interpreted as requiring "some concerted volitional activity on the part of those beneficially interested before an entity can be deemed an 'association.'" *Elm Street Realty Trust v. Commissioner*, 76 T.C. 803, 813 (1981); *see also Kilgallon v. Commissioner*, 96 F.2d 337, 340 (7th Cir.1938); McGee, *Problems of the Unintentional Corporation: The Association Taxable As A Corporation*, 29 N.Y.U. Tax Inst. 853, 863 (1971). Such concerted volitional activity includes not only participation in the creation of the trust but also subsequent affirmative entry into the enterprise through actions such as the purchase of beneficial interests. *Morrissey*, 296 U.S. at 357, 56 S.Ct. at 295, *Elm Street Realty Trust*, 76 T.C. at 814.

■ Plaintiffs contend that the income beneficiaries of GNIOP are not "associates," because they "did not create" the trust, have no participatory powers in trust affairs, and lack a reversionary interest in the corpus of the trust. Defendant disputes this contention, arguing that the initial beneficiaries participated actively in the creation of GNIOP and that all subsequent certificate holders entered into the enterprise as associates by purchasing their beneficial interest. The court agrees with defendant's contentions. First, the record belies plaintiffs' conclusion that the initial beneficiaries of the trust "were not the moving force" behind the creation of GNIOP. To the contrary, it is clear that such beneficiaries, *i.e.*, the shareholders of the Railway in 1906, had substantial if not complete control, by reason of the 1899 agreement between the Railway and Lake Superior, *supra*, over the disposition of the stock that ultimately became the trust corpus. Indeed, GNIOP was only created in December 1906 because Lake Superior was directed by a resolution of the Board of Directors of the Railway, approved by its shareholders, to transfer said stock to the four named trustees. Additionally, the following passage of an 1899 resolution of the board of directors of the Railway, ratifying the concurrent contract with Lake Superi-

or, *supra*, indicates that the beneficiaries apparently indirectly contributed the funds utilized in acquiring the corpus by Lake Superior:

> Whereas the stocks, bonds and properties transferred to the [Lake] Superior Company by such contract were acquired with funds *which might otherwise have been lawfully distributed* in the form of dividends to and among the stockholders of [the Railway]. . . .

Although pertinent regulations provide that the tax status of a trust is not to be determined solely by whether the beneficiaries supplied the corpus of the trust, the fact that the corpus was so supplied (directly or indirectly) is certainly probative on the question of whether the beneficiaries were "associates." *See* Treas.Reg. § 301.-7701–4(a) and (b) (1979).

■ Secondly, while the Trust Agreement does not facially disclose that the income beneficiaries possess significant participatory powers in the affairs of GNIOP, it is long settled that an entity's "trust" or "association" status under the I.R.C. is not determined by whether the beneficiaries exercise control over trust affairs. *Helvering v. Combs*, 296 U.S. at 368, 56 S.Ct. at 288; *Morrissey*, 296 U.S. at 358, 56 S.Ct. at 295; *Hecht v. Malley*, 265 U.S. 144, 44 S.Ct. 462, 68 L.Ed. 949 (1924). Instead, it is manifest that the presence or absence of control by beneficiaries in trust affairs becomes significant only when the beneficiaries took no part in the creation of the trust. *See Elm Street Realty Trust*, 76 T.C. at 815–16, and cases cited therein.

■ Additionally, and pertinent to the case at bar, the Supreme Court stated in *Morrissey* that "the terms of an association may make the *taking* or *acquiring* of shares or interest sufficient to constitute participation, and may leave the management or even *control* of the enterprise to designated persons." 296 U.S. at 357, 56 S.Ct. at 295. Beneficiaries such as plaintiffs who bought shares of an already established trust would therefore be no less "associates" than those who had initially

formed the enterprise. It is further significant (particularly as to the taxable year 1979) that, according to the trust's 1979 Form 10–K, the trustees and officers own 1,400 shares, as well as a beneficial interest in a trust holding 4,831¼ shares of GNIOP. Although the record does not show when any of the trustees initially acquired their certificates of beneficial interest, the foregoing transforms the "officers"/trustees, who administered and managed GNIOP, into income beneficiaries and thus "associates" in the enterprise.

■ Finally, as to plaintiffs' third contention, this court attaches no definitive significance to the fact that the income beneficiaries of the trust, unlike the shareholders of a corporation, have no potential reversionary interest. The test of whether an entity is an "association" for federal income tax purposes is one of "resemblance" to a corporation, not "identity." *Morrissey,* 296 U.S. at 357, 56 S.Ct. at 295. Although certain interests of the certificate holders and the reversionary beneficiary in GNIOP may be hostile, the law requires only that an association be "voluntary"; no conjunctive requirement exists that the associates be "friendly." *Walker v. United States,* 194 F.Supp. 522, 526 (D.Mass.1961). Accordingly, it is clear beyond cavil from the sum total of the evidence that GNIOP meets the "associates" requirement under Treas.Reg. § 301.7701–2.

### 2. *Business Objective.*

■ The second requirement under the regulations, *supra,* for an express trust to be classified as an "association" under the I.R.C., is that the trust must have been devised as a vehicle to carry on a business and divide the profits therefrom.

■ Plaintiffs forcefully contend that GNIOP does not possess the requisite business purpose to qualify as an "association." They support this contention by averring that the *activities* of GNIOP—leasing mineral lands, and collecting and distributing income to the beneficiaries—mirror those of similar ordinary family trusts. They further assert that the powers of the trustees, as delineated in the Trust Agreement of 1906, constitute merely the powers to conserve and protect the corpus. In contrast, defendant argues that it is clearly evident from the 1906 Trust Agreement, which has never been amended, that GNIOP has the unbridled purpose to engage in business.

The persuasive force of plaintiff's first contention, even if assumed to be factually correct, is overcome by the long-settled rule that the primary source for determining the business objective of a trust is *the trust instrument.* *See* 7 Mertens, Law of Federal Income Taxation § 38A.12 (1984 rev.) and cases cited therein at n. 5. "The parties are not at liberty to say that their purpose was other or narrower than that which they formally set forth in the instrument under which their activities were conducted." *Helvering v. Coleman-Gilbert,* 296 U.S. at 374, 56 S.Ct. at 287. Consequently, "[t]he presence of [business] powers, regardless of their exercise, require a finding of a business objective for purposes of section 7701(a)(3) and the regulations thereunder." *Elm Street Realty Trust,* 76 T.C. at 811. (Emphasis added.)

■ In determining from the trust instrument whether an entity has the requisite business purpose, the regulations that define the term "trust" contemplate that a distinction should be drawn between "ordinary trusts" and "business trusts."[11] The

---

11. This regulation provides in pertinent part:

(a) *Ordinary trusts.* In general, the term "trust" as used in the Internal Revenue Code refers to an arrangement created either by a will or by an inter vivos declaration whereby trustees take title to property *for the purpose of protecting or conserving it for the beneficiaries* under the ordinary rules applied in chancery or probate courts. *Usually the bene-*

*ficiaries of such a trust do no more than accept the benefits thereof and are not the voluntary planners or creators of the trust arrangement.* However, the beneficiaries of such a trust may be the persons who create it and it will be recognized as a trust under the Internal Revenue Code if it was created for the purpose of protecting or conserving the trust property for beneficiaries who stand in

basic dichotomy provided therein postures "ordinary trusts" as entities designed simply and exclusively to protect or conserve property for the beneficiaries, while "business trusts" are entities technically cast in the trust form but with the paramount purpose of conducting a business for profit. Implicit in the "business objective" test is the realization that almost every trust involves the doing of some business. *See Cebrian v. United States,* 149 Ct.Cl. 357, 375, 181 F.Supp. 412 (1960); *Helvering v. Washburn,* 99 F.2d 478, 481 (8th Cir.1938); *Myers v. Commissioner,* 89 F.2d 86, 89 (7th Cir.1937). However, the requirement of "carrying on business" in the commercial sense, envisioned under § 301.7701–2(a)(1), obviously requires more. The dispositive question, therefore, becomes whether the carrying on of business by a trust in the commercial sense is incidental to the paramount purpose of conserving or protecting the property. In the context of trusts formed as a medium for owning, operating, leasing, and/or selling real estate, the rule developed by case law has been aptly stated as follows:

> The courts have held quite uniformly that a trust devoted to the liquidation of real estate or the passive holding of real estate and the collection of income therefrom was not taxable as an association; and that a trust would be deemed to be an association *if its principal objects and activities involved* dealing in real

the same relation to the trust as they would if the trust had been created by others for them. Generally speaking, an arrangement will be treated as a trust under the Internal Revenue Code if it can be shown that the purpose of the arrangement is to vest in trustees responsibility for the protection and conservation of property for beneficiaries who cannot share in the discharge of this responsibility and, . therefore, are not associates in a joint enterprise for the conduct of business for profit.

(b) *Business trusts.* There are other arrangements which are known as trusts because the legal title to property is conveyed to trustees for the benefit of beneficiaries, but which are not classified as trusts for purposes of the Internal Revenue Code because they are not simply arrangements to protect or conserve the property for the beneficiaries. These trusts, which are often known as business or commercial trusts, *generally are creat-*

estate, *development of tracts of land,* construction of improvements, or the purchase, *management,* or sale of properties. (Emphasis added.)
7 Mertens, *supra,* at § 38A.19; *quoted in Rohman v. United States,* 275 F.2d 120, 125 n. 7 (9th Cir.1960); *see also Morrissey,* 296 U.S. at 357, 56 S.Ct. at 295.

■ Turning to GNIOP's trust instrument, as well as the facts underlying the creation of the trust, there can be no question that the "principal objective" in the creation of GNIOP was the exploitation of minerals for profit on lands owned by the trust, with a substantial managerial role to be played by the trustees. Paragraph 1 of the Trust Agreement mandates that the trustees shall "exercise their powers ... to preserve the existence and the organization of such corporations, and to secure at all times proper management of the property and business and affairs of such corporation." This paragraph, the effect of which is not limited by any other part of the agreement, gives the trustees wide latitude to manage all business operations involving the trust corpus, even though this power has been exercised by leasing the trust's mineral land to outside firms which have conducted the day-to-day mining operations. Paragraphs 9, 10, 13, and 14, *supra,* of the Trust Agreement complement the foregoing broad managerial powers by permitting the trustees to dispose of trust

*ed by the beneficiaries simply as a device to carry on a profit-making business which normally would have been carried on through business organizations that are classified as corporations* or partnerships under the Internal Revenue Code. However, the fact that the corpus of the trust is not supplied by the beneficiaries is not sufficient reason in itself for classifying the arrangement as an ordinary trust rather than as an association.... *The fact that any organization is technically cast in the trust form, by conveying title to property to trustees for the benefit of persons designated as beneficiaries, will not change the real character of the organization if, applying the principles set forth in §§ 301.7701–2, ... the organization more nearly resembles an association ... than a trust.*
Treas.Reg. § 301.7701–4(a) and (b) (1979). (Emphasis added.)

property and reinvest the proceeds and hold such with the same powers and duties, hire however many employees they see fit, and make the rules to govern the operation of the trust.

Moreover, the business purpose of GNIOP is apparent from the undisputed facts surrounding its creation. It is clear from the Congressional testimony of James J. Hill, submitted into the record uncontradicted, that the land constituting the corpus was purchased with the objective of developing it, through mining operations, for the financial benefit of the shareholders of the Railway, as well as attracting additional hauling revenues for the Railway itself. The fact that funds which otherwise would have gone to the shareholders of the Railway were utilized to purchase said land, as indicated by the 1899 resolution of the Railway's board of directors, *supra*, further underscores the business purpose of the series of transactions culminating in the formation of GNIOP. Finally, it is apparent from the record that GNIOP was created in trust form, rather than corporate form, for extraneous legal reasons, including the Hepburn Act, antitrust laws, and state restrictions against the ownership by a railroad of land not used for railroad operations. Against this background, there is not one scintilla of credible support for the conclusion that GNIOP was created for the purpose of conserving and protecting the corpus for the beneficiaries.

Accordingly, it appears clear from GNIOP's Trust Agreement and the circumstances of the trust's creation that GNIOP was created for business purposes, as defined by case law and applicable regulations. The Eighth Circuit in *Reynolds* similarly found, based primarily on the trust instrument and many of the same circumstances listed above, that GNIOP was formed "as a set-up, which would ... permit the properties to serve as nearly as possible their initially intended business purpose." 184 F.2d at 298.[12] *Reynolds* also teaches, however, that to the extent a business purpose cannot be determined from the foregoing two elements, it is appropriate to consider "the manner and extent that the powers [in the Trust Agreement] have shown themselves capable of being utilized in actual operations." *Id.* at 296; *see also Outlaw v. United States*, 204 Ct.Cl. 152, 163, 494 F.2d 1376 (1974). The court in *Reynolds*, applying the foregoing standard, found that the trustees of GNIOP have "exercise[d] a directing hand in the policies, interrelationships and affairs of the mineral land corporations," by means of active negotiation of royalty rates, participating in reorganizations of said corporations, etc., and being compensated handsomely for such services. 184 F.2d at 298. Hence, the court concluded that "[t]he trust therefore clearly was engaged in the activity of supplying its controlled corporations with directional and policy-making services, for which it was compensated by the corporations." *Id.*

Plaintiffs have not challenged this conclusion of the Eighth Circuit on any ground, and this court sees no basis for disagreement with the holding in *Reynolds* that the activities of the trustees from 1938–1944 in exercising their powers add further support to the proposition that GNIOP was created for a business purpose. Plaintiffs contend, however, that significant changes have taken place since *Reynolds* was decided in the characteristics of the trust, primarily because of the liquidation of the mineral land corporations in 1956, so as to make *Reynolds* no longer apposite to the facts herein. They start with the clearly erroneous assertion that the sole rationale for the opinion in *Reynolds* was the "business activity," consisting of the "directional and policy-making services," engaged in by the trustees for the tax years 1938–1944. They then suggest that because said directional services were provided to the mineral land corporations, which no longer existed after 1956, the "business activity" on which the holding in

---

12. The court notes that plaintiffs do not set forth any facts to challenge the holding in *Reyn-olds* regarding the setting and circumstances of the creation of GNIOP.

*Reynolds* was purportedly premised no longer occurred in 1979.

Even if the foregoing factual conclusion of plaintiffs with respect to the trustees' activity in 1979 were accepted (and for reasons stated, *infra,* it is not), the opinion in *Reynolds* was properly based on the trust instrument and circumstances surrounding its making, and only *"fortified"* by the trustees' subsequent business activities. 184 F.2d at 298. Consequently, a change in the activities of the trustees does not have a material impact on the viability of the opinion in *Reynolds,* unless the powers set out in the Trust Agreement have likewise changed.

Plaintiffs then allege, however, that the liquidation in 1956 rendered paragraph 1 of the Trust Agreement a "nullity." They support this contention by citing the language of paragraph 1, which gives the trustees, "while holding ... shares of stock ... of [the mineral land] corporations," general managerial power "of such corporation[s]." They then argue that because the "corporations" referred to therein no longer existed and the trustees were no longer "shareholders" after 1956, said paragraph should be read out of the Trust Agreement. With paragraph 1 deleted, plaintiffs aver that GNIOP only has the characteristics of an ordinary "family trust" under the Trust Agreement.

Plaintiffs' restrictive and hospitable reading of the trust instrument likewise cannot withstand serious scrutiny. It is apparent from the Trust Agreement itself that paragraph 1 thereof was not rendered a nullity as a result of the liquidation. Paragraph 9 of the Agreement, *supra,* gives the trustees "full power" to sell or exchange the shares of the ten corporations for other property, and affords the trustees the *"same powers and duties"* with respect to the newly-acquired properties as they had with respect to the proprietary corporations. When the Trust Agreement is read as a whole, it therefore follows that subsequent to the liquidation (involving an exchange of the stock in the corporations for the mineral land), the trustees retained the business powers contained in paragraph 1. Consequently, the language of paragraph 1 giving the trustees certain powers "as such shareholders" must be construed, as the court said in *Reynolds* in a different context, "not as being a technical limitative term ..., but as representing simply incidental or casual expression." 184 F.2d at 298.

Additionally, as defendant forcefully urges, it is patently clear from the record that the business activities of GNIOP did *not* change to any significant degree after the liquidation in 1956. This point was expressly stated in the 1956 annual report of GNIOP, quoted *supra,* and was also candidly conceded by GNIOP's president in an uncontroverted deposition. Both before and after the liquidation, the trustees headed a staff of engineers, accountants, and other personnel who closely monitored the operations of the lessee mining companies. Plaintiffs failed to allege any substantive change affecting the employees' activities after 1956, aside from the fact that their employer changed from the corporations to the trust. In pursuance of the powers given in paragraphs 1 and 9 of the Trust Agreement, the trustees continued to hold a significant and active managerial role. If anything, this role increased; the only change of note after the liquidation was that they wore the hats of trustees, as well as direct owners of the mineral lands, rather than those of trustees and controlling shareholders of the corporations. For instance, they authorized the purchase of considerable mineral lands through their lessee, the United States Steel Corporation, and spent a large proportion of their time (in some instances up to 80%) negotiating complex leases with the lessee mining companies. The foregoing powers and activities of the GNIOP trustees lead inexorably to the conclusion that the objective of the trust's creators was no less to establish a business (*i.e.,* that of leasing their mineral lands for the exploitation of iron ore) than if they had set up an active iron mining company. Consequently, this court is compelled to hold that GNIOP, as it existed

during the taxable year 1979, was an entity with the principal objective to carry on business and divide the gains therefrom.

### 3. *Effect of State Court Litigation.*

■ Plaintiffs also suggest that the holding in *Hill* has been rendered invalid by subsequent non-tax trust litigation in the state courts in Minnesota. This litigation was brought by the trustees in 1972 to settle a dispute brewing between certain certificate holders and the successors in interest to the reversionary beneficiary, Burlington Northern, Inc. The dispute related to the authority and/or duty of the trustees to convert the remaining assets of the trust to cash prior to the termination of the trust, *i.e.,* 18 lives plus 20 years after the death of the last survivor. When the case came up to the Supreme Court of Minnesota for the second time, the certificate holders argued, *inter alia,* that the trustees should be exempted from the duties imposed by the law of trusts and estates, because GNIOP was a "business trust" rather than an ordinary trust. As such, they argued that they should not be bound by the strict term provisions of the Trust Agreement.

In its discussion of this contention, the court's opinion mentioned a number of characteristics of GNIOP that resembled those of an ordinary trust, as well as others that resembled those of a business trust. The court commented but did not hold, pursuant to various principles of trust law, that:

> On balance, this trust seems to bear more of the characteristics of an ordinary trust conducting a business than of a common-law or Massachusetts business trust.

*In the Matter of Great Northern Iron Ore Properties,* 263 N.W.2d 610, 619–20 (Minn. 1978). The pertinent holding of the court, however, was as follows:

> [W]e *need not* finally decide the proper characterization of the trust to resolve the extent of the trustees' duties because it has been recognized that even a common-law or Massachusetts business

trust, although governed by special corporate-like rules in certain respects, is subject to the underlying equitable and fiduciary duties imposed by the common law of trusts.

*Id.* at 620. (Emphasis added.)

Notwithstanding the foregoing disavowal of the court, plaintiffs rely substantially on the subjective gloss of the *dicta* of the Minnesota court stating that GNIOP "seems to bear more of the characteristics" of an ordinary family trust than a business trust. It is sufficient to say that the quoted language gives plaintiffs no comfort. The state court in its utterance was not only dealing with an issue totally unrelated to the tax status of GNIOP, as it expressly acknowledged—it also stated in unambiguous terms that it would *not* decide the proper characterization of the trust. *Id.* at 619, 620. Moreover, it is axiomatic from the following language of *Morgan v. United States,* 309 U.S. 78, 80–81, 60 S.Ct. 424, 425–26, 84 L.Ed. 585 (1940), as well as applicable regulations, that the classification of an entity as a trust under state law has no probative value with respect to its classification for federal income tax purposes:

> State law creates legal interests and rights. The federal revenue acts designate what interests or rights, so created, shall be taxed. Our duty is to ascertain the meaning of the words used to specify the thing taxed. If it is found in a given case that an interest or right created by local law was the object intended to be taxed, the federal law must prevail no matter what name is given to the interest or right by state law.

*See also* Treas.Reg. § 301.7701–1(c) (1979); *Murray v. United States,* 231 Ct.Cl. 481, 687 F.2d 386, 392 (1982).

For the foregoing reasons, the decisions of the Minnesota state courts cannot be deemed to have any effect on the validity of the decision in *Reynolds* (or in the case at bar) with respect to the substantive federal income tax status of GNIOP.

#### 4. *Effect of Changes in Law.*

■ Plaintiffs also contend that in addition to the factual change stemming from the 1956 liquidation, and the litigation in the Minnesota courts, *supra,* the legal tax treatment of associations and trusts has radically changed in such a way as to dilute, if not destroy, the viability of the decision in *Reynolds, supra.* First, they urge that the 1960 Treasury Regulations, *supra,* as interpreted by the Court of Claims in *Zuckman v. United States,* 207 Ct.Cl. 712, 524 F.2d 729 (1975), represent a change in the controlling legal principles from those applicable when *Reynolds* was decided. Specifically, they argue that the "preponderance" test in the 1960 regulations constitutes a material change from earlier prevailing law governing the distinction between "trusts" and "associations" under the I.R.C.

We must reject this contention as being utterly without foundation. The "preponderance test" referenced by plaintiffs presumably comes from the following sentence of § 301.7701–2(a)(3) of the 1960 regulations: "An unincorporated organization shall not be classified as an association unless such organization has more corporate characteristics than noncorporate characteristics." It is clear from the opinion in *Zuckman* that the 1960 regulations containing said preponderance test were promulgated in order to make it more difficult for unincorporated professional groups, viewed by the I.R.S., as more properly partnerships, to meet the standards of corporate resemblance. 207 Ct.Cl. at 722, 524 F.2d 729. The change was prompted largely by the decision in *United States v. Kintner,* 216 F.2d 418 (9th Cir.1954), which held

an association of doctors to be taxable as a corporation under the Treasury regulations promulgated in 1939. *See id.;* Fisher, *Classification under Section 7701—The Past, the Present, and Prospects for the Future,* 30 Tax Law. 627, 630 (1977).

Some commentators have taken the view that the 1960 regulations as interpreted by *Zuckman,* are at variance with the principles of *Morrissey,* with respect to the distinction between partnerships and corporations. *See, e.g.,* Fisher, *supra.* This questioning of the regulations has occurred because *Morrissey* arguably required "overall resemblance" to a corporation, rather than specific adherence to a majority of enumerated `factors. *Id.* at 645. It is clear, however, that with respect to the distinction between "trusts" and "associations," the 1960 regulations are entirely consistent with *Morrissey.* Both *Morrissey* and the 1960 regulations require that an association be composed of associates, joining together with the common objective of forming a business for profit.

Consequently, there cannot be said to be any material change between the law governing the tax treatment of GNIOP in 1979 and the governing law when *Reynolds,* premised on the *Morrissey* principles,[13] was decided.[14]

Finally, plaintiffs aver that a number of other widely held, publicly traded, unincorporated organizations engaged in similar leasing of mineral and timber lands are taxable as trusts, according to various unspecified rulings of the I.R.S. They then argue that the entities they cite provide useful insights into how "ordinary trusts" operate, and should serve as standards against which GNIOP should be judged.

---

**13.** The principles utilized in *Reynolds,* as noted, *supra,* were derived from the earlier *Nee* decision of the Eighth Circuit. See 184 F.2d at 296. *Nee,* in turn, is premised on the Supreme Court's opinion in *Morrissey.*

**14.** Plaintiffs also argue that the *Reynolds* court relied on "other" factors for its decision aside from the heretofore mentioned "associates" and "business purpose" factors, and that *Zuckman* held that it was impermissible to consider any such "other" factors, in lieu of special circum-

stances not present in this case. See 207 Ct.Cl. at 742, 524 F.2d 729. It is apparent from *Reynolds,* however, that the so-called "other" factors mentioned therein, such as the trustees' ability to hire employees and make rules regarding the Trust's operations, were considered by the court of appeals to be probative of the business purpose in the creation of GNIOP. Thus, it would be permissible under *Zuckman* for this court to consider the same factors considered by the Eighth Circuit in *Reynolds.*

Inherent in this argument is the suggestion that the "legal atmosphere" surrounding the tax treatment of trusts and associations has somehow changed since 1950, so as to render the decision in *Reynolds* inapposite or erroneous. *See Commissioner v. Sunnen*, 333 U.S. 591, 599–600, 68 S.Ct. 715, 720, 92 L.Ed. 898 (1948).

This contention is likewise without merit. Since § 301.7701–2(a)(1) of the regulations expressly provides that "the presence or absence of [corporate] characteristics will depend upon the facts of each individual case," plaintiffs' entitlement must stand on its own bottom. Moreover, plaintiffs concede in their reply brief that, "a showing that others have been treated leniently, generously, or erroneously ·cannot provide an independent basis for recovery." Hence, neither the foregoing bland assertions nor any other authority found by this court suggests that the controlling principles of law regarding the tax treatment of "trusts" and "associations" have changed materially since *Reynolds* was decided.

## CONCLUSION

The regulations teach that an organization *"will be* treated as an association" if the quantum of the corporate characteristics are such that the organization simply "more nearly resembles a corporation ... than a trust." The probative uncontroverted evidence adduced in this case, however, conveys the overwhelming impression that GNIOP, manifested by the setting and circumstances of its creation, the broad powers of the trustees, and the manner and extent by which such powers have been administered in actual operation for more than 75 years, resembles a corporation far more than a trust. Accordingly, there can be no reasonable conclusion in this case other than that GNIOP has been and continues to be an active "association" properly taxable as a corporation under the 1954 Internal Revenue Code.

The adroit "set-up" orchestrated by the Railway and its stockholders, ingenious though it may have been, must therefore succumb to the old adage that form is not to be exalted over substance.

Because this court finds and holds that GNIOP, for the taxable year in issue, is an "association" taxable as a corporation (*i.e.,* a business trust), we necessarily find that the disbursements therefrom received by plaintiffs were properly reported as dividends on their 1979 joint income tax return. The foregoing therefore mandates that defendant's motion for summary judgment be granted, plaintiffs' cross-motion be denied, and the Clerk will dismiss the petition.

IT IS SO ORDERED.